[No. F003673. Fifth Dist. Apr. 30, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT M., Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Antonia D. Radillo, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, W. Scott Thorpe and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**VANDER WALL, J.*—**

### STATEMENT OF THE CASE

After a jury trial, appellant was found not guilty of Penal Code[1] section 261, subdivision (2) (forcible rape); section 288a, subdivision (c) (forcible oral copulation); section 286, subdivision (c) (forcible sodomy); section 289 (forcible penetration of anal opening by foreign object); and section 236 (false imprisonment).

Thereafter, appellant filed a petition to seal and destroy arrest records pursuant to sections 851.8, subdivision (e) and 851.85. The trial judge denied the petition and appellant appeals.

The notice of appeal contained a request for appointment of attorney and a declaration of appellant's indigency.

---

*Assigned by the Chairperson of the Judicial Council.

[1]All further statutory references are to the Penal Code unless otherwise indicated.

## STATEMENT OF THE FACTS

### Criminal Trial

### A. Prosecution case

The alleged victim, Rosalie L., attended a birthday party at the Fresno home of her sister and brother-in-law, Julia and Jesus Fernandez, on June 12, 1982. Ms. L. drank several cups of beer during the party. After the party ended, because Jesus Fernandez had driven her to his residence, Ms. L. expected him to drive her home. However, Jesus was asleep and Julia was tired, so Julia suggested that Ms. L. remain for the night, and be driven home in the morning.

Concerned because her 13-year-old son had left the party earlier to return to her home, and unable to telephone him (because her home had no phone), at about 2 a.m., Ms. L. decided to walk from her sister's house to her (Ms. L.'s) home. As she walked along Olive Street near Blackstone, appellant pulled up next to her in his car and offered her a ride. Because appellant looked nice, and she wanted to get home, Ms. L. got into his car.

Although appellant had promised to take her directly to her home, he made a U-turn on Olive in a direction away from Ms. L.'s home. Despite her protests, appellant drove to his apartment, explaining that he would take her to her home after they had had a couple of beers.

When they arrived at his apartment, appellant exited his car, came around to where Ms. L. was sitting, and told her to get out, saying, "Well, let's go inside." After entering appellant's apartment, Ms. L. noticed appellant locked the door with a key.

Appellant and Ms. L. sat on a sofa talking for 30 to 90 minutes. Appellant then told Ms. L. to get up, and began making the sofa into a bed. When she asked what he was doing, appellant said, "Don't you want to make sex?" Appellant then forced her to remove all her clothes, pushed her onto the sofa bed, and compelled her to have intercourse and to orally copulate him; he also inserted something hard into her rectum at least twice. Prior to the attacks, Ms. L. cried, screamed, struggled, and pleaded to be taken home but appellant put a string across her mouth and threatened to kill her if she did not remain silent. Appellant repeatedly threatened to kill her during the attacks, and at various times handcuffed one or the other of her hands to the sofa or handcuffed her hands together. Appellant also forced Ms. L. to put her tongue in his anus and to lick the area surrounding it.

During the sexual assaults, although appellant had told Ms. L. that his name was Scott, she began calling him Greg.

After the sexual attacks, appellant and Ms. L. got up from the sofa bed. She accepted his offer of a beer and smoked a cigarette. Appellant then asked her whether she liked him and if she was mad at him. Because she was afraid, she told appellant that she liked him and was not angry. Ms. L. asked to be taken home, and appellant said that he would take her home after he had purchased some cigarettes. At some point before leaving appellant's apartment, he and Ms. L. hugged and kissed.

Appellant and Ms. L. then drove to a Mayfair Market at Olive and Blackstone, where appellant purchased cigarettes (after warning Ms. L. to stay in the car or "something else is going to happen"). Appellant returned to the car and gave Ms. L. a pack of "Kools" cigarettes, which she had told him was her brand. Ms. L. then asked to be taken home, but appellant began driving back toward his apartment, saying that he wanted to go back to his house and "do it the normal way." When they arrived at appellant's apartment, Ms. L. refused to go inside. When appellant lowered her seat and jumped on top of her, threatening to "do it out here," she first resisted, then told him to go and open the apartment door. When appellant went to open the door to his apartment, Ms. L. grabbed her shoes and ran for help.

No one answered the door at the first house she approached. She ran to a second, where Gloria Silva, who observed Ms. L. to be crying, upset and hysterical, let her inside. The police and Julia Fernandez were called. Ms. Silva observed that Ms. L. had red, circular scrape marks on her wrists, moved as though in pain—taking very small steps—and smelled of alcohol (but did not seem intoxicated). Julia Fernandez came to the Silva residence and observed that Ms. L. was frightened and upset, and had red lines around her wrists. Ms. L. complained to Julia Fernandez that her anus hurt.

City of Fresno Police Officer Phillips responded to the call from Ms. Silva. He entered the Silva residence, and observed Ms. L. sitting on the sofa, crying and making sounds that indicated she was in great pain. He saw red rings around her wrists. After questioning Ms. L., Officer Phillips, following Ms. L.'s instructions, drove to appellant's apartment complex. Ms. L. indicated that one of two apartments was the site of the assaults. The officer then took Ms. L. to the hospital.

Ms. L. was given a "medical-legal rape examination" by a physician at the hospital, which revealed sperm in her vagina, blood in her vagina (consistent with rape or the onset of the menstrual cycle), blood in her rectum (consistent with forcible sodomy or an inflammation of the colon), a moist

perineum—the area between the vagina and the rectum—(consistent with sexual assault and drainage of fluid from the vagina), and that she had swelling and redness of both wrists (consistent with handcuff injury). Ms. L. was in such discomfort during the rectal examination that the physician was unable to use an anuscope to determine if there was tearing of the rectum. Ms. L. would not give the physician a direct answer when he asked if cunnilingus had taken place, but she denied that she had vomited or that her assailant (whom she identified as "Greg") had ejaculated in her mouth. Her performance on a horizontal nyastagmus test correlated with a sufficient ingestion of alcohol to make her dizzy.

A criminalist made various tests on two "sexual assault collection kits" (one of Ms. L. and one of appellant). Ms. L.'s tests revealed that her a.b.o. system blood type was group O, her p.g.m. system blood type was type 1, and that she was a "secretor." Appellant's a.b.o. system blood type was group A, his p.g.m. blood type was group 21, and he was also a secretor. Other tests indicated that semen was present in Ms. L.'s vagina and rectum, and that a.b.o. type A and p.g.m. type 21 indicators were present in Ms. L.'s vagina. A.b.o. type A and p.g.m. type 21 indicators were present on Ms. L.'s panties as well.

Ms. L. stayed with her mother for about two and a half to three weeks after the sexual assault, during which time her mother placed towels with alcohol and hot water on her daughter's wrists and buttocks.

Fresno City Police Detective McFadden interrogated appellant (after advising him of his constitutional rights and obtaining a waiver) on June 14, 1982, concerning the alleged sexual assaults. Appellant stated that about 3:30 a.m. on June 13, 1982, he had been driving down Olive when he observed Ms. L. having an argument with some people in a car. Appellant thought she needed help, so he stopped and offered her a ride. When she accepted, he told her he was going to "her" [sic, must have meant "his"] place, and she agreed to accompany him.

Appellant said that he had been to a party earlier that evening where he had been drinking, and that he was drunk at the time he met Ms. L. Appellant was unable to provide Detective McFadden with specifics as to the location of the party or who else was present. When he and Ms. L. arrived at his apartment, they had a few sips of beer, then began kissing and engaging in foreplay. Appellant and Ms. L. both took her clothes off; she was a little intoxicated, but not "super drunk." They got into bed, both naked. Ms. L. pointed out some handcuffs lying nearby, and told appellant that if he wanted to have sex with her, he would have to force her. Appellant and Ms. L. then engaged in intercourse and oral copulation, but not sodomy.

Appellant whispered to Detective McFadden that he (appellant) believed Ms. L. was kind of kinky and perverted. Appellant stated that he had handcuffed Ms. L. to the bed and had handcuffed her hands together, during which times he placed his penis into her mouth and her vagina, ejaculating only in her vagina. When first asked by McFadden why Ms. L. would bring charges of rape against him, appellant said he did not know, but later he said that she had asked him for $20 (not in payment for sexual favors) and he had refused to give it to her.

## B. Defense case

Two instructors from the law school attended by appellant, four of his fellow students, and four friends and former coworkers testified that appellant was a peaceful person, courteous and respectful toward women, and that the charge of forcible sexual assaults was inconsistent with his character.

Appellant, age 25, was on June 12, 1982, employed by his father at a frame shop and was a second-year law student at a law school in Fresno. That evening, he attended a party in the vicinity of Shields and Maple in Fresno at which he drank beer and whiskey; he could feel the effects of the alcoholic beverages when he left the party.

After taking some other partygoers to their home, appellant was driving along Olive at about 2:40 a.m. when he noticed Ms. L. walking around the back of a car, waving her arms as if to flag him down. Appellant stopped near the car and offered Ms. L. a ride. She asked appellant for help, saying, "They're out to get me. They're going to kill me." Appellant felt it was in both their interests to leave the area, so when Ms. L. got in his car he drove away.

Ms. L. said her name was Rosa, and did not give a last name. Appellant told her his name, and asked if she would like to go to his apartment, to which she agreed. Appellant opened the car door for Ms. L. when they arrived at his apartment, and the two went inside. Appellant may have locked the door by pushing a button, but he did not use the keyed dead bolt because it had been malfunctioning for a few months. Appellant and Ms. L. sat and talked and drank some beer for almost two hours. At about 4:30 a.m., appellant said that he was going to bed, and that she was welcome to stay if she liked. Ms. L. stood up; appellant opened the sofa bed and spread a sleeping bag over it. Appellant took off his shirt and socks, leaving on his trousers; Ms. L. took off her blouse and pants, and they both got into bed. They began to kiss and fondle each other, and removed their remaining clothing. He orally copulated her, and she orally copulated him. Appellant

rolled on top of Ms. L. and was about to insert his penis into her vagina when she "said something to the effect of, if you really want to get me off, why don't you use the cuffs." A pair of handcuffs which appellant had purchased for use in a former investigator job were lying on his television. Appellant got the handcuffs, placed them on Ms. L., and resumed intercourse. After a few minutes, he removed the handcuffs when she complained that they were too tight. Appellant ejaculated in Ms. L.'s vagina, but did not recall and thought it unlikely that anal intercourse took place. Appellant did not place any foreign object in her anus. Prior to going to bed, Ms. L. had called appellant "Greg," but did not do so during the lovemaking.

Appellant continued to hug and caress Ms. L. for a short time after completing intercourse, then considered going to sleep. They had a cigarette and because her remaining cigarettes were broken, Ms. L. said that she wanted to get some more, so they dressed, got in his car and drove to Mayfair Market on Olive. It was about 5:15 a.m. Appellant entered the store (Ms. L. remained in the car), purchased cigarettes for each of them ("Kools" for her, at her request), and returned to the car, at which time Ms. L. said that she had to be getting home. Appellant said he needed to check his phone answering machine for messages first, and she said that was okay. Appellant drove back to his apartment, went inside (leaving her in the car) and checked for messages (taking about four minutes). Before he went inside, Ms. L. had asked him for $20. Appellant told her he might take her to dinner sometime but would not give her money.

When appellant returned to his car, Ms. L. was gone. Appellant was surprised, but not shocked, since she had exhibited changes of mood throughout the evening. Appellant went to a friend's house for a few minutes, then returned home to shower and sleep. He remained at home until that evening, and did not learn of Ms. L.'s charges until contacted by Detective McFadden the next day.

*C. Petition*

No testimony or evidence was presented during the hearing on the petition. In connection with the petition, appellant submitted the declarations of the jury foreman and another juror, who stated inter alia that they believed that appellant was innocent of the charges. The foreman also stated that the deliberations lasted 2 hours, that an initial vote taken 10 minutes into the deliberations was 11 for not guilty and 1 undecided, and that after further deliberations all 12 jurors voted not guilty.

After argument by counsel for both parties, the trial court stated that it viewed the test for granting the petition to be "where it appears to the Court

that presided over the trial . . . the defendant was factually innocent." The court further stated that it believed the relevant statutes should be liberally construed. Nevertheless, the court did not consider appellant factually innocent because, in its judgment, the jury decided the case when it had been demonstrated that Ms. L. "embellished" her testimony by claiming that her panties had been ripped even though physical evidence showed that the panties were not damaged. The court stated appellant's demeanor indicated "she was feeling very harsh both toward the defendant and the defendant's lawyer, and she was never provided the opportunity to explain why she did embellish as she did." The court suspected she embellished because she was "very angry."

Finally the court stated: "It was clear that the complaining witness was involved in a sex act that caused a great deal of pain to her and must have been very painful at the time. She was a very unsophisticated person with an 8th grade education who by her testimony thought in Spanish. We encouraged her to testify in English.

"I think the verdict was a correct one based upon the evidence before the jury. In Scotland I understand they have three verdicts, one is guilty, one is not proved and one is innocent. That is not our system, and again, in good conscience, reviewing the entirety of the case, while I feel it was an appropriate verdict, I do not believe that defendant was shown by the facts to be factually innocent. Motion is denied."

## DISCUSSION

### I. When Trial Court Relief Is Proper

*A. The trial court did not err in denying appellant's section 851.8 petition to seal and destroy records*

We note at the outset, that the applicable section governing appellant's petition is section 851.8, subdivision (e):[2] "Whenever any person is ac-

---

[2]Appellant's petition was also made pursuant to section 851.85. Section 4 of Statutes 1980, chapter 1172, at page 3943, the legislation which enacted current section 851.8, provides that if section 851.8 is repealed according to its terms—see subdivision (o)—then section 851.85 will become operative. Section 851.85 is identical in wording to the original, repealed 1975 version of section 851.8. Section 851.85 provides: "Whenever a person is acquitted of a charge and it appears to the judge presiding at the trial wherein such acquittal occurred that the defendant was factually innocent of the charge, the judge may order that the records in the case be sealed, including any record of arrest or detention, upon the written or oral motion of any party in the case or the court, and with notice to all parties to the case. If such an order is made, the court shall give to the defendant a copy of such order and inform the defendant that he may thereafter state that he was not arrested for such charge and that he was found innocent of such charge by the court."

quitted of a charge and it appears to the judge presiding at the trial wherein such acquittal occurred that the defendant was factually innocent of such charge, the judge may grant the relief provided in subdivision (b)." Section 851.8, subdivision (b) provides, in relevant part, that "[a] finding of factual innocence and an order for the sealing and destruction of records pursuant to this section shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. In any court hearing to determine the factual innocence of a party, the initial burden of proof shall rest with the petitioner to show that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. If the court finds that this showing of no reasonable cause has been made by the petitioner, then the burden of proof shall shift to the respondent to show that a reasonable cause exists to believe that the petitioner committed the offense for which the arrest was made."

Appellant asserts that where a jury has acquitted a person charged with criminal offenses, on a petition for relief under section 851.8, subdivision (e), the trial court should grant relief unless "there were substantial co[u]ntervailing considerations which point[] to a contrary conclusion of innocence." Appellant extracts this "test" from *People* v. *Carl B.* (1979) 24 Cal.3d 212 [155 Cal.Rptr. 189, 594 P.2d 14], which dealt with the discretion of a trial court to sentence a minor to state prison despite a Youth Authority (YA) recommendation that he be committed to their care. In *Carl B.*, although the Youth Authority, a probation officer, a psychiatrist consultant, and a clinical psychologist each concluded that the defendant was suitable for commitment to YA, the trial court sent him to prison because (1) his offense was serious and (2) society needed protection from him. (*Id.*, at p. 219.) The Supreme Court reversed, holding that although the trial court was not bound by the YA recommendation, the opinions of experts should be given great weight, and there must be substantial evidence of *lack* of suitability in order to disregard the YA recommendation. (*Id.*, at pp. 217-219.) The high court also held that the trial court's justification for the state prison term was erroneous, since a YA commitment is appropriate for serious offenders, and will protect society just as well as incarceration in prison. (*Id.*, at pp. 219-220.)

*Carl B.* is inapplicable to the present case. This is not a situation where a panel of experts has evaluated a defendant in order to recommend a proper manner of incarceration. The trial court deciding a section 851.8 petition must determine whether a defendant is factually innocent of the crime(s) with which he was charged and then acquitted. The statute instructs the court that it may find a defendant factually innocent if there was no reasonable cause to believe that the defendant committed the act. The jury's verdict, which simply indicates that the prosecution did not prove the defend-

ant's guilt beyond a reasonable doubt, does not directly address whether he committed the charged offense (cf. *In re Coughlin* (1976) 16 Cal.3d 52, 57-58 [127 Cal.Rptr. 337, 545 P.2d 249]); it may, for example, have been based instead upon a failure of the prosecution to meet the reasonable doubt standard, even though the jury believed by a preponderance of evidence that the defendant was culpable. The trial court does not "disagree" with the jury's verdict when it denies a section 851.8 petition. It refines that verdict by distinguishing between those cases where acquittal is based upon actual innocence and those where acquittal is based upon the prosecution's failure of proof.

■ There are no cases defining the standard of reasonable cause in the context of a section 851.8 petition. The standard, however, is well grounded in criminal jurisprudence: "reasonable cause" has been defined as " 'that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' " (*People* v. *Rhinehart* (1973) 9 Cal.3d 139, 151 [107 Cal.Rptr. 34, 507 P.2d 642], disapproved on other grounds in *People* v. *Bolton* (1979) 23 Cal.3d 208 [152 Cal.Rptr. 141, 589 P.2d 396] [arrest without a warrant]; *People* v. *Hampton* (1981) 116 Cal.App.3d 193, 200 [172 Cal.Rptr. 25] [holding defendant to answer]; *People* v. *One 1961 Ford Falcon* (1963) 215 Cal.App.2d 149, 152 [30 Cal.Rptr. 110] [search and seizure]; 36 Words and Phrases (1962) pp. 448-467; 36 Words and Phrases (1984 pocket pt.) pp. 56-64.)

■ ■ Moreover, in reviewing a lower court's determination of reasonable cause, we will not substitute our judgment for that of the trial court. Hence, the trial court ruling will not be set aside if there exists some "rational ground for assuming the possibility that an offense has been committed and that the defendant is guilty of it." (*People* v. *Hampton, supra,* 116 Cal.App.3d at p. 200.)

■ In the present case, there is ample rational ground for assuming appellant committed the offense. A woman showed undisputable signs of having engaged in sexual acts, claimed that her participation was coerced, and reported that she had been assaulted. The police had no alternative but to investigate her allegations, and when much of her story was confirmed by that investigation, the prosecution was duty bound to present the case to a jury for their resolution. Although the appellant was ultimately found not guilty, based on the evidence before the trial court it was not error for the trial court to find there was reasonable cause to believe that the appellant had committed the act(s).

■ The purpose behind section 851.8 supports this analysis. Section 851.8 is for the benefit of those defendants who have not committed a crime.

It permits those petitioners who can show that the state should never have subjected them to the compulsion of the criminal law—because no objective factors justified official action—to purge the official records of any reference to such action. "The Legislature thus recognized that the requirement of proof beyond a reasonable doubt often results that defendants, who are not factually innocent, are acquitted." (*People* v. *Glimps* (1979) 92 Cal.App.3d 315, 321 [155 Cal.Rptr. 230].) Hence, much more than a failure of the prosecution to convict is required in order to justify the sealing and destruction of records under section 851.8. Relief under the statute requires a finding of factual innocence and the statutory language commits the determination of that issue to the trial court. If the Legislature had wanted to treat a verdict of acquittal as some sort of rebuttable presumption of factual innocence it could easily have so provided. Only in those cases where the defendant is actually innocent is the trial court justified in sealing and destroying a defendant's arrest records.

■ *B. The trial court accorded appellant's declarations the weight to which they were entitled*

The appellant submitted the declarations of two jurors in support of his petition pursuant to section 851.8, subdivision (e). At the hearing on the petition, the trial court made the following remarks with regard to the declarations: "I read your motion, the declarations you have set forth here. *I doubt that those declarations should be considered by the Court since this is my decision.* I'll of course allow you to argue that matter and review the Code sections and their citations." (Italics added.)

Appellant contends that the trial court either failed to consider the jurors' declarations (which stated that the jurors believed appellant to be innocent) or accorded them too little weight in his determination of the petition.

The respondent contends that (1) the trial court did not foreclose consideration of the declarations in the quoted remarks; (2) the statute permits the trial court to disregard such evidence at its discretion; and (3) the declarations were entitled to little or no weight. We agree.

Section 851.8, subdivision (b) provides, inter alia, that the "judicial determination of factual innocence made pursuant to this section *may* be heard and determined upon *declarations,* affidavits, police reports, or any other evidence submitted by the parties which is material, relevant and reliable." (Italics added.)

There is no case law bearing upon the interpretation of this portion of the relevant statute. Since the court is commanded by the statute to determine

whether the appellant is factually innocent, the beliefs of the jurors in this regard appear to have no relevance or materiality, since they did nothing more than listen to the evidence produced at trial, and knew nothing about the events in question except what they learned at trial. Jurors are not "experts" at deciding guilt or innocence, and appellant submitted the opinions of only two of the twelve who sat on the jury panel in his case. If a criminal defendant attempted to introduce at his trial as evidence of his innocence the fact that two knowledgeable people believed him to be innocent, this "evidence" would be rejected out of hand. Such "evidence" has no better place in a proceeding to determine appellant's "factual innocence." Certainly, it was discretionary with the trial court whether to consider the declarations and what weight to accord them in considering appellant's petition.

■ *C. The trial court properly considered the victim's testimony with regard to pain in determining factual innocence*

During the announcement of its decision to deny the petition, the trial court said: "Again, I reviewed the entire record, these are just a few of the things that occur to me. *It was clear that the complaining witness was involved in a sex act that caused a great deal of pain to her and must have been very painful at the time.*" (Italics added.)

Appellant appears to be asserting that the jury's verdict of not guilty conclusively established that Ms. L. consented to any act of sodomy, and thus the trial court was not permitted to consider the pain she suffered, as evidenced by those who observed her, including a physician, after the alleged assaults occurred. This argument is merely a variation on the theme of appellant's entire appeal—that the jury's verdict is tantamount to a finding of factual innocence, and should be adopted by the trial court except in unusual circumstances. As discussed above, the statute does not suggest or require that the verdict be given such effect. Since the trial court must independently determine factual innocence, evidence that Ms. L. suffered such pain from the sex acts that her walking was affected and that she would not permit an instrument to be inserted into her rectum strongly suggests that her participation in the sex act was coerced.

Additionally, the evidence of pain was merely one of the factors considered by the court in its review of the entire trial record. From the evidence, the trial court may have concluded that appellant had in fact compelled Ms. L. to engage in the various sexual acts. The trial court evidently found Ms. L. a believable witness, but acknowledged that her conduct at trial alienated the jury and detracted from the prosecution's ability to prove guilt beyond a reasonable doubt. Under these circumstances, no error in the trial court's determination of the petition has been shown.

■ *II. An Indigent Person Moving to Expunge His Record Pursuant to Section 851.8 Is Not Entitled to Court-appointed Counsel at the Hearing and on Appeal, and to a Free Transcript on Appeal*

On March 27, 1984, after appellant had filed an application for appointment of counsel and a memorandum of points and authorities concerning the appealability of the denial of his petition to seal and destroy arrest records, this court ordered that the Office of the State Public Defender be appointed counsel for appellant on this appeal.

On June 7, 1984, this court directed the parties to file letter briefs addressing ■ whether appellant was entitled to court-appointed counsel before the superior court and upon appeal in connection with his petition, and ■ whether appellant was entitled to a free record on appeal from the denial of said petition.

On July 26, 1984, this court ordered that the issues which were the subject of its June 7, 1984, order would be considered as issues on appeal in the present matter.

An indigent person is entitled to court-appointed counsel on a first appeal granted as a matter of right from a criminal conviction (*Douglas* v. *California* (1963) 372 U.S. 353, 357 [9 L.Ed.2d 811, 814-815, 83 S.Ct. 814]); and, on appeal from a felony conviction, an indigent person is entitled to a free transcript (*Griffin* v. *Illinois* (1956) 351 U.S. 12, 18-20 [100 L.Ed. 891, 898-899, 76 S.Ct. 585, 55 A.L.R.2d 1055]; *In re Henderson* (1964) 61 Cal.2d 541, 542-543 [39 Cal.Rptr. 373, 393 P.2d 685]). Appellant contends that because his appeal of denial of his petition to seal and destroy records pursuant to section 851.8 is purportedly authorized by section 1237, subdivision (b) (which states than an appeal may be taken "by the defendant . . . [f]rom any order made after judgment, affecting the substantial rights of the party"), he falls within the ambit of the authorities cited above.

The proceedings contemplated by section 851.8 occur after any state action or criminal proceeding has terminated favorably toward the defendant, and the right to have records expunged is a purely statutory one, invoked against the state at the request of the subject of the records. (See *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859 [132 Cal.Rptr. 464, 553 P.2d 624], cert. den. 429 U.S. 1109 [51 L.Ed.2d 562, 97 S.Ct. 1143].) Nothing in the cited cases, nor anything brought to the attention of this court by appellant, suggests that an indigent who is *acquitted* after being prosecuted for commission of a felony has any right to counsel or to a transcript of proceedings with regard to a postprosecution proceeding initiated by himself against the state.

Appellant was entitled to neither court-appointed counsel nor a free transcript in his postprosecution efforts to have his record expunged.

The judgment is affirmed.

Hamlin, Acting P. J., and Martin, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 29, 1985. Mosk, J., was of the opinion that the petition should be granted.