106 Cal.Rptr.2d 514 (2001)
88 Cal.App.4th 1297
The PEOPLE, Plaintiff and Appellant,
v.
Jeanie Louise ADAIR, Defendant and Respondent.
No. B138462.
Court of Appeal, Second District, Division Three.
May 9, 2001.
Review Granted August 22, 2001.
*515 Gil Garcetti and Steve Cooley, District Attorneys, George M. Palmer, Fred Klink, and Patrick D. Moran, Deputy District Attorneys, for Plaintiff and Appellant.
John Steinberg, under appointment by the Court of Appeal, for Defendant and Respondent.
FIDLER, J.[*]

INTRODUCTION
Jeanie Louise Adair (defendant) was charged with the murder of her husband, Robert Adair (Pen.Code, § 187, subd. (a)). The district attorney of Los Angeles County also alleged special circumstances pursuant to Penal Code sections 190.2, subdivision (a)(1), murder carried out for financial gain, and 190.2, subdivision (a)(15), lying in wait. It was also alleged that pursuant to Penal Code section 12022, subdivision (b)(1), she had used a dangerous or deadly weapon in the commission of the offense.
After approximately a one-month long jury trial, the defendant was acquitted. The People had presented a strong case based upon circumstantial evidence. The defendant presented evidence that not only raised a reasonable doubt with the jury, but now in hindsight, causes the People to concede that the jury had a basis for having a reasonable doubt, based upon the evidence presented.
This matter comes before us after the defendant filed a petition pursuant to Penal Code section 851.8, for a finding of factual innocence, which, after a hearing, was granted by the trial court. The People have appealed the granting of the petition. The granting of such a petition is appealable, pursuant to Penal Code section 851.8, subdivision (p)(1). (See also People v. White (1978) 77 Cal.App.3d Supp. 17, *516 144 Cal.Rptr. 128; People v. Glimps (1979) 92 Cal.App.3d 315, 155 Cal.Rptr. 230; People v. Pogre (1986) 188 Cal.App.3d Supp. 1, 234 Cal.Rptr. 590 and People v. Matthews (1992) 7 Cal.App.4th 1052, 9 Cal.Rptr.2d 348.)

STANDARD OF REVIEW

1. Trial Court Standard.

The standard of review in the trial court is not in dispute, as it is set forth in Penal Code section 851.8 and interpreted in subsequent cases.
Penal Code section 851.8 states, in pertinent part, as follows:
"(a) In any case where a person has been arrested and no accusatory pleading has been filed, the person arrested may petition the law enforcement agency having jurisdiction over the offense to destroy its records of the arrest .... [¶] (b) ... The district attorney may present evidence to the court at such hearing. Notwithstanding Section 1538.5 or 1539, any judicial determination of factual innocence made pursuant to this section may be heard and determined upon declarations, affidavits, police reports, or any other evidence submitted by the parties which is material, relevant and reliable. A finding of factual innocence and an order for the sealing and destruction of records pursuant to this section shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. In any court hearing to determine the factual innocence of a party, the initial burden of proof shall rest with the petitioner to show that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made .... [¶] ... [¶] (e) Whenever any person is acquitted of a charge and it appears to the judge presiding at the trial wherein such acquittal occurred that the defendant was factually innocent of such charge, the judge may grant the relief provided in subdivision (b). [¶] ... [¶] (p) A judgment of the court under subdivision (b), (c), (d), or (e) is subject to the following appeal path: [¶] (1) In a felony case, appeal is to the court of appeal." (Italics added.)
Although Penal Code section 851.8, subdivision (e) which applies to acquittal after trial, allows the trial judge to grant the petition if "it appears to the judge presiding at the trial wherein such acquittal occurred that the defendant was factually innocent of such charge...." such seemingly unlimited discretion is in fact limited by subdivision (e)'s reference to the relief standard set forth in subdivision (b).
The term "reasonable cause" means the "arrestee thus must establish that facts exist which would lead no person of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion that the person arrested is guilty of the crimes charged." (People v. Matthews, supra, 7 Cal.App.4th at p. 1056, 9 Cal.Rptr.2d 348, citing People v. Scott M. (1985) 167 Cal.App.3d 688, 699, 213 Cal.Rptr. 456.)
"[Penal Code] section 851.8 is for the benefit of those defendants who have not committed a crime. It permits those petitioners who can show that the state should never have subjected them to the compulsion of the criminal law-because no objective factors justified official action-to purge the official records of any reference to such action. `The Legislature thus recognized that the requirement of proof beyond a reasonable doubt often results that defendants, who are not factually innocent, are acquitted.' [Citations.]" (People v. Scott M., supra, 167 Cal.App.3d at pp. 699-700, 213 Cal.Rptr. 456, emphasis added.)
*517 "Establishing factual innocence, within the meaning of Penal Code section 851.8, entails establishing as a prima facie matter not necessarily just that the arrestee had a viable substantive defense to the crime charged, but more fundamentally that there was no reasonable cause to arrest him in the first place." (People v. Matthews, supra, 7 Cal.App.4th at p. 1056, 9 Cal.Rptr.2d 348, emphasis added.)

2. Appellate Standard.

In order to resolve this matter, we must first determine the appropriate standard of appellate review. In discussing the standard of review on appeal, the court of appeal in People v. Scott M., supra, 167 Cal.App.3d at p. 699, 213 Cal.Rptr. 456, a case wherein the trial court denied a section 851.8 petition, determined that "... in reviewing a lower court's determination of reasonable cause, we will not substitute our judgment for that of the trial court. Hence, the trial court ruling will not be set aside if there exists some `rational ground for assuming the possibility that an offense has been committed and that the defendant is guilty of it.'" (Citing People v. Hampton (1981) 116 Cal.App.3d 193, 200, 172 Cal.Rptr. 25.) The Hampton case involved a contention on appeal, after conviction, that there had been insufficient evidence presented at the defendant's preliminary hearing to hold him to answer for trial.
In a part of the opinion that was clearly dicta, the court in Hampton noted that in ruling on a Penal Code section 995 motion, if the reviewing court found some evidence to support a commitment in a criminal case, the reviewing court could not inquire into the sufficiency of that evidence. (People v. Hampton, supra, 116 Cal.App.3d at p. 200, 172 Cal.Rptr. 25.) In any event, the issue in Hampton has no relationship to the review required in Penal Code section 851.8.
In People v. Pogre, supra, the appellate department of the Santa Clara Superior Court noted that Scott M., supra, involved a trial court's denial of a petition under Penal Code section 851.8. Pogre dealt with a finding by the trial court that the defendant was factually innocent, after an acquittal following a jury trial, the same situation presented in this case. The Pogre court stated: "In our case, of course, we determine whether there is any substantial evidence contradicted or uncontradicted which will support the finding by the trial court that defendant was factually innocent." (Pogre, supra, 188 Cal.App.3d at p. Supp. 8, 234 Cal.Rptr. 590, citing People v. Reilly (1970) 3 Cal.3d 421, 425, 90 Cal.Rptr. 417, 475 P.2d 649.) Reilly involved a review of a conviction after a jury trial and has nothing to do with any issue involved in a petition under section 851.8. The court in Pogre, supra, then set forth the reasonable cause standard in subsection (b) of section 851.8, supra, and stated: "It is against this standard that we examine the facts to determine if the trial judge's order is supported by substantial evidence." (Pogre, supra, at p. Supp. 9, 234 Cal.Rptr. 590.)
In People v. Matthews, supra, 7 Cal. App.4th 1052, 9 Cal.Rptr.2d 348, the Court of Appeal did not set forth the standard of review that was applied, but it is clear that the court conducted an independent review of the facts of the case in order to ascertain whether or not the trial court had abused its discretion in granting a petition pursuant to section 851.8, by reference to the standard set forth in subsection (b).
We respectfully decline to follow any language in Scott M. or Pogre, supra, that suggests we are bound by the trial court's findings if any substantial evidence supports them. To do this would allow a trial *518 court to ignore a set of facts that clearly established reasonable cause, as long as there were also facts that supported the possibility of innocence, in clear violation of the language of subdivision (b) of section 851.8, as interpreted in the Matthews case, supra.
After reviewing the cases cited supra, we believe the appropriate standard for our review is to independently review the record to ascertain if any reasonable cause exists to believe defendant committed the offense for which she was arrested and tried and determine if the trial court abused its discretion in granting the petition. With this standard of review in mind, we set forth the facts established at defendant's trial.

FACTS
Defendant and the decedent Robert Adair (Robert) were married. Defendant was having an affair with her orthopaedic surgeon, Doctor Michael Shapiro.
On November 5, 1996, Robert received two phone calls from defendant while Robert was at work. The receptionist who originally took the calls was familiar with defendant's voice. She also heard a portion of Robert's conversation which was consistent with his talking to defendant. Robert took her second call between 11:15 a.m. and 11:30 a.m.
Robert was seen in front of their residence at approximately 12:15 p.m., walking towards it with mail in his hand. The residence was only a few minutes away from Robert's workplace.
Between 1:00 p.m. and 2:00 p.m., a neighbor heard a banging at his gate and discovered defendant upset and asking for help. Defendant stated her husband was lying on the floor and not breathing. Defendant told the neighbor not to go inside the residence because "the person is still in there."
When rescue personnel arrived they found Robert dead, with blood around his head. The police arrived and found evidence the residence had been ransacked, although valuables and cash were still present. Defendant claimed that certain items were missing. A detective testified the ransacking was not consistent with a burglary or home invasion robbery. A car parked in the garage had a hood that was warm to the touch. Defendant later stated she had driven her husband to a market near his work that morning.
Defendant had blood on her, there was blood on Robert, and blood was found in various locations in the residence. The police did not have the blood typed. An autopsy performed on Robert concluded that he died from multiple blunt force trauma to the head. The trauma was consistent with blows from a baseball bat. (A bat was recovered near the body.)
When interviewed at the scene, defendant told police that a man posing as a gas company employee gained entry to her home, knocked her down, kicked her in the face and then took her to the upstairs part of the residence where her hands were bound with electrical tape; the intruder asked "Where is your stuff, bitch? I want your stuff." She was gagged with something black.
The intruder left her to go downstairs when a noise was heard, which defendant assumed was the arrival of Robert. Defendant did not hear any noise and after managing to free herself, went downstairs and found Robert in a pool of blood.
The description defendant gave to one of the police officers described the intruder as a white male, heavy set with a big stomach. He had a goatee and was wearing *519 a baseball cap turned backwards on his head.
Her statement to another police officer who interviewed her described the suspect as a black male. She also told this officer the suspect had pulled a knife on her when entering her residence, stating "If you scream I'll kill you bitch." After she was tied up, beaten and kicked, Robert came home and called out to her, whereupon the intruder went to a different room, grabbed a baseball bat, threatened defendant to keep quiet and went downstairs and she then heard a "thump." Defendant told various police officers different variations and descriptions of what took place. She also indicated she had removed the tape used to bind her with a tool that tightened her knee brace. One especially notable difference in defendant's description of the events that took place concerned her confinement. Defendant told one version which had her tied to a chair and another version which had her hog-tied, without a chair being involved.
Various police emergency and medical personnel offered different accounts of the severity of defendant's injuries, ranging from opinions she was making her injuries appear worse than they were and were in fact inconsistent with her description of the events that took place, to those that believed she had suffered serious injury.
One alleged injury merits a more detailed discussion. Defendant had a back condition that required surgery. According to the testimony of her paramour, Dr. Shapiro, the condition did not exist prior to November 5, 1996, and in his opinion occurred on November 5, 1996. He further opined the condition could not have been self-inflicted.
The surgery was performed by an associate of Dr. Shapiro's, Dr. Thomas Hopkins. He testified he did not believe the condition was faked, however the condition was not necessarily caused by an injury.
A scientific analysis of the tape used to bind the defendant found that some segments had been torn and some had been cut. An analysis of the knee-brace tool showed no evidence of tape residue.
DNA and blood analysis showed defendant's blood on some scissors, a bathroom basin, a throw rug, a stairway and her T-shirt. Certain blood evidence was either not collected and/or analyzed.
A Los Angeles Police Department criminalist testified that in his opinion, he would have expected to see the decedent's blood on the person who wielded the bat and none was found on defendant's clothes. (The People theorized defendant drove away after the killing and discarded some bloody clothing and then returned home, which would explain the warm hood on the car found by the police.)
The criminalist further testified that in his opinion, the blood found on defendant's clothes was consistent with her having been beaten. He also testified he would have expected Robert's blood to be on the bat. His conclusions indicated that defendant had not struck Robert with the bat.
Evidence was presented that in February or March of 1997, defendant told Robert's sister (Simone) that she had found the gag used in her attack and it was covered in blood and saliva.
Simone's roommate, Ida, testified that in approximately June of 1997, the defendant asked Ida to ask Simone to tell the police that Simone was with defendant's father when the gag was discovered. Simone testified similarly and also testified that when she told defendant she would not lie, defendant stated "Well, then I'm screwed."
Evidence was presented as to defendant's motive to murder Robert. In addition *520 to the extra-marital affair, testimony was presented that Robert planned on moving to Las Vegas and defendant was unsure if she wanted to go. Evidence was presented that defendant wanted to be with Shapiro if she could "get rid of Robert." It was also shown that Robert and defendant had filed for bankruptcy in mid-1996. Testimony also revealed that defendant received approximately $400,000 in life insurance and had settled a personal injury claim for almost $400,000 one month prior to Robert's death.
The defense presented evidence (through cross-examination of defendant's lover, Dr. Shapiro) that his wife, Mindy, from whom he was separated, knew about the affair, was angry and vindictive about it and had talked about killing or severely injuring defendant Defense evidence also showed that Mindy had impersonated defendant in stealing defendant's medical records. Dr. Shapiro testified that Mindy was a talented mimic and that he now believed Mindy may have impersonated the defendant in the phone call he had received on November 5, 1996, at a time when the defendant was supposed to be tied up. Defendant's mother testified she and defendant's father were present when the defendant found the gag used in her attack, although they were in a different room.
In addition, testimony was presented that an individual impersonating a gas company employee was seen outside the Adair residence on November 5, 1996, who may have resembled a "third striker ex-convict, Gary Pinuelas," who had a history of violence consistent with the injuries sustained by the defendant and Robert.
Pinuelas and an associate by the name of Robert Kugler were observed five miles from the Adair residence within one hour after the murder was committed. A witness testified Kugler resembled a man in a gas company uniform he had seen outside the Adair residence.
Also, testimony was presented that Mindy knew an alleged ex-convict in Las Vegas who allegedly had ties to organized crime. Psychological evidence was presented by both sides in order to explain the different statements that the defendant made at various times. This evidence was presented in rebuttal by the People, through the testimony of Dr. Robert Brook, a clinical psychologist, who concluded that he could find no psychological or psychiatric category to explain defendant's various accounts of what had happened. The defense cross-examined Dr. Brook as to the contrary findings by another psychologist, Dr. Kodimer, whose report Dr. Brook had reviewed.

THE TRIAL COURT'S FINDINGS
In ruling on the defendant's petition, the trial court found as follows:
"So now what I have done is I have reviewed certain portions of the trial transcript, and I have a fairly good recollection of the evidence. I take very good notes while I am on the bench on my computer, and so I have reviewed my notes as well.
"I think significant in this case is and I am going to rule based upon my independent review of the evidence, the weight to be given the evidence, including a consideration of the credibility of all witnesses who have testified. It's one thing to read it, it's another thing to be here and listen to it. And while some evidence might seem maybe less significant if viewed in the abstract by reading it, it becomes more significant when you're here to listen to it.
"I think significant in this court's mind is that there was no blood of the victim on Jeanie Adair's clothing, and that testimony came as a complete surprise to the district *521 attorney, based on the statements [the prosecutor] made just after that.
"And the argument that Jeanie Adair had time to clean up, get into her car and drive off somewhere and dump the clothing and get rid of it so that there wouldn't be any blood I don't think is borne out by the evidence. The only evidence that might suggest that is the officerI can't remember his last name, started with a `K'.
"[The Prosecutor]: Kreitzman.
"[The Court]: Kreitzman, one of the first witnesses to testify, that at some unspecified time he felt the hood of a car that was unidentified, other than it was in the garage and it was warm to the touch.
"There was no evidence of the weather conditions. I don't know what kind of car it was. I don't know whether a kind of car like that could be driven and ten hours later still be warm to the touch in that particular garage on that particular day. I don't know.
"So there is no reasonable reason why there would be no blood on the clothing of the defendant.
"I would also note that Robert Adahwas at the Wells Fargo Bank. Apparently, according to Jeanie Adair's statement that was introduced by the district attorney at trial, she dropped him off at a market near work so he could make a transaction and wire money to his mother. She had testified that she stated that, and there is some corroboration of the fact that he was going to send the money to the mother because, according to Adair's statements, she said that he had told her that there was a problem wiring the money.
"And so he obviously went to the Wells Fargo Bank at Maclay and Glenoaks, which was their major branch, and he was there at 10:52. At least, that's the time of the transaction. It would obviously take him some time to get from Sylmar Medical Center, assuming that's where he went, or he went to that Von's to make the transaction and then to Wells Fargo Bank.
"While he was there, he would have been at that branch at Maclay and Glenoaks for some period of time. Obviously, he was upset and trying to get the attention of people. He was banging on the bullet-proof glass, and they finally talked to him and explained to him that it's not feasible to wire a thousand dollars the way he wanted it, and suggested other procedures. And then he would have had to get back to Sylmar Medical Center. So I am considering that.
"I don't believe that there is any doubt that there was a gas company employee not a gas company employee, but somebody disguised as a gas company employee that was on the premises on November the 5th of 1996. That's uncontroverted.
"There is absolutely no evidence to suggest that that was, in fact, a gas company employee that was simply there on a date that wasn't scheduled for a meter reading. If that was the case, we would have records to show that the meters were read on that day.
"I don't believe that Jeanie Adair's injuries were self-inflicted. That's based on my listening to the medical evidence here. I don't I just don't think it's credible to believe that she could have inflicted particularly the injury to her back that required a rather dangerous surgery to repair that, and I don't see that there's any motive on the part of Jeanie Adair to murder her husband based on Jeanie Adair's infidelity. It might be the other case if Robert Adair had been the one who was cheating on his wife, but that wasn't the case.
"So considering everything, the court finds that there is no reasonable cause to believe that Jeanie Adair committed the *522 offense with which the arrest was made; to wit, murder.
"And therefore, the petition to declare her factually innocent is granted."

DISCUSSION
We can quickly dispose of two issues raised by the People. They contend that because the defendant did not testify at the hearing on the petition or, at trial, relief under Penal Code section 851.8 is precluded. They cite no law in support of that proposition and we summarily reject it.
In addition, the People allege that because the defendant was held to answer after a preliminary hearing and because a motion pursuant to Penal Code section 1118.1 was denied by the trial court, the petition should not have been granted. This overlooks the fact that the evidence changes at different times in a criminal proceeding and neither event necessarily precludes relief under Penal Code section 851.8.
We have set forth the appropriate standard of review, supra. Applying that standard, we are compelled to find that defendant/petitioner failed to carry her burden in the trial court of establishing that there was no reasonable cause to believe she committed the offense for which the arrest was made.
Although the case presented by the People was circumstantial, there was clearly enough evidence to have allowed the jury to convict the defendant and had that occurred, we can state without hesitation we would have sustained such a conviction against a claim of insufficiency of the evidence.[1]
We recognize the factors that exist in the record and relied upon the trial court, in granting defendant's petition. However, even the strongest piece of evidence in her favor, her back injury which required surgery, was conceded by her surgeon to be a condition that could have arisen without any injury.
A reasonable, objective review of the evidence establishes that many people of ordinary care and prudence would believe defendant guilty of the crime charged. As set forth, supra, one reasonable interpretation of the evidence strongly suggests that defendant bludgeoned her husband to death and concocted a story to cover her crime. It is also reasonable to find from evidence presented that defendant constantly changed her explanation of what had taken place, had made telephone calls when she claimed to have been tied up, and claimed to have freed herself from her confinement in a manner inconsistent with common sense and the scientific evidence presented.
Further, this reasonable view of the evidence also suggests defendant had personal and financial motivation to kill her husband and that she tried to have witnesses lie to the police. No explanation was given to explain why, if the defendant was the intended victim, she was allowed to live and Robert was killed.
We also recognize the jury had a reasonable doubt and that an experienced criminal trial judge felt she was factually innocent. However, as was said in People v. Pogre, supra, 188 Cal.App.3d at p. Supp. 9, 234 Cal.Rptr. 590, "It goes without saying that the trial court has broad discretion to determine whether the standard required by section 851.8 has been met. In discussing judicial discretion the Supreme Court has said: `... discretion, however, is neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and *523 in a manner to subserve and not to impede or defeat the ends of substantial justice.' (People v. Warner (1978) 20 Cal.3d 678, 683, 143 Cal.Rptr. 885, 574 P.2d 1237.) Such discretion is abused when an order `"exceeds the bounds of reason, all the circumstances being considered."'" (Emphasis added.)
Based on our discussion above, we must find that defendant has failed to meet her burden and therefore the trial court exceeded its discretion in granting the petition.

DISPOSITION
The order of the trial court granting the petition pursuant to Penal Code section 851.8 is reversed. The matter is remanded to the trial court with instructions to enter an order denying the petition.
KLEIN, P.J., CROSKEY, J, concur.
NOTES
[*] Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant article VI, section 6 of the California Constitution.
[1] During oral argument, defendant's appellate counsel conceded there was sufficient evidence to sustain a conviction on appeal.