[No. B056602. Second Dist., Div. Five. June 29, 1992.]

THE PEOPLE, Plaintiff and Appellant, v.
ROLAND G. MATTHEWS, Defendant and Respondent.

### Counsel

Ira Reiner, District Attorney, Maurice H. Oppenheim and Corene S. Locke-Noble, Deputy District Attorneys, for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, John E. Burns, James R. Buckley and Robert W. Hodges for Defendant and Respondent.

### Opinion

BOREN, J.—

## Introduction

In this case, we decide that respondent, a corporate president, did not carry his burden to show he was factually innocent of certain industry-related crimes and that the trial judge erred in granting respondent's motion to seal and destroy his arrest records. We reverse.

## PROCEDURAL BACKGROUND

Diceon Electronics, Inc. (Diceon), a company which manufactures printed circuit boards, two of the company's managers, and its president, respondent Roland G. Matthews, were charged in a twelve-count information which alleged the illegal disposal of hazardous waste (Health & Saf. Code, § 25189.5, subd. (b); nine counts, one felony and one misdemeanor count involving Matthews among others) and the illegal storage of hazardous waste (Health & Saf. Code, § 25190; three counts, all three misdemeanor counts involving Matthews among others.) Pursuant to a negotiated disposition and prior to a preliminary hearing, Diceon pled nolo contendere to three felony counts of the illegal disposal of hazardous waste, and two company managers (Richard Thomas and Peter Jonas) pled nolo contendere to one misdemeanor count of illegal disposal of hazardous waste.[1] Also as a part of the negotiated disposition, the charges against Matthews were dismissed on the People's motion and pursuant to Penal Code section 1385. Subsequently, the trial court granted Matthews's motion to seal and destroy his booking and arrest records. (Pen. Code, § 851.8, subd. (b).) The People appeal from the order sealing and destroying the records.

## DISCUSSION

### I. *Procedural and Substantive Standards for Sealing and Destroying Arrest Records*

Penal Code section 851.8 sets forth the guidelines for sealing and destroying the arrest records of a person who is factually innocent. Where, as here, a person has been arrested and an accusatory pleading filed but no conviction has occurred, the defendant may "petition the court which dismissed the action for *a finding that the defendant is factually innocent of the charges for which the arrest was made.*" (Pen. Code, § 851.8, subd. (c), italics added.) "A finding of factual innocence and an order for the sealing and destruction of records . . . *shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made.* In any court hearing to determine the factual innocence of a party, the initial burden of proof shall rest with the petitioner to show that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. If the court finds that this showing of no reasonable cause has been made by the petitioner, then the burden of proof

---

[1]Thomas and Jonas were placed on summary probation and entitled to limited expungement of their records, pursuant to Penal Code section 1203.4. Diceon was placed on three years' summary probation and ordered to refrain from similar hazardous waste violations and to pay a fine of $600,000.

shall shift to the respondent to show that a reasonable cause exists to believe that the petitioner committed the offense for which the arrest was made." (Pen. Code, § 851.8, subd. (b), italics added.)

"[Penal Code] section 851.8 is for the benefit of those defendants who have not committed a crime. It permits those petitioners who can show that the state should never have subjected them to the compulsion of the criminal law—because *no objective factors justified official action*—to purge the official records of any reference to such action. 'The Legislature thus recognized that the requirement of proof beyond a reasonable doubt often results that defendants, who are not factually innocent, are acquitted.' [Citation.]" (*People* v. *Scott M.* (1985) 167 Cal.App.3d 688, 699-700 [213 Cal.Rptr. 456].) For example, a failure of the prosecution to meet its burden of proof of guilt beyond a reasonable doubt could be due to the suppression of illegally obtained evidence. Penal Code section 851.8, subdivision (b), *specifically permits the court to receive all relevant evidence on the subject* of factual innocence, notwithstanding Penal Code sections 1538.5 and 1539 (relating to the suppression of evidence for the purpose of trial). (See *People* v. *Glimps* (1979) 92 Cal.App.3d 315, 322 [155 Cal.Rptr. 230].) Similarly, a dismissal in the interests of justice (Pen. Code, § 1385), as Matthews obtained in the present case, does not necessarily imply factual innocence, but rather may reflect the result of a negotiated or pragmatic disposition of the case. (92 Cal.App.3d at pp. 323-324.)

In determining at a court hearing whether factual innocence exists, the arrestee bears the preliminary burden of establishing that "no reasonable cause exists to believe that [he] committed the offense." (Pen. Code, § 851.8, subd. (b).) The arrestee thus must establish that facts exist which would lead no person of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion that the person arrested is guilty of the crimes charged. (*People* v. *Scott M., supra,* 167 Cal.App.3d at p. 699.)

█ Establishing factual innocence, within the meaning of Penal Code section 851.8, entails establishing as a prima facie matter not necessarily just that the arrestee had a viable substantive defense to the crime charged, but more fundamentally that there was no reasonable cause to arrest him in the first place. For example, a legal defense which is unrelated to the conduct of the arrestee and his innocence, such as entrapment, may be available "not because the defendant is innocent but because it is a lesser evil that some criminals should escape than that the government should play an ignoble part. [Citation.]" (*People* v. *Pogre* (1986) 188 Cal.App.3d Supp. 1, 7 [234 Cal.Rptr. 590].) On the other hand, other legal defenses may be so related to the defendant's own conduct that the existence of the defense negates a

requisite element of the offense or otherwise eliminates culpability, thereby revealing no reasonable cause to believe the arrestee committed an offense and establishing factual innocence, within the meaning of Penal Code section 851.8. Accordingly, we do not accept the People's simplistic position, that proof of a defense to the crime charged cannot establish factual innocence. Rather, it depends upon the nature of the defense whether a defense to the crime charged establishes factual innocence, for the purposes of Penal Code section 851.8.

II. *Matthews's Defense of Lack of Personal Involvement in Criminal Violations and His Alleged Attenuated Corporate Responsibilities for the Offending Conduct*

A. *Nature of the Offenses Charged*

■ "Lawmakers have wide latitude to declare an offense and to exclude, or include, elements of knowledge and diligence." (*People* v. *Martin* (1989) 211 Cal.App.3d 699, 714 [259 Cal.Rptr. 770, 86 A.L.R.4th 383].) In counts VIII and IX, Matthews was charged with one felony and one misdemeanor violation of Health and Safety Code section 25189.5, which alleged the improper disposal of hazardous waste.[2] ■ "[Health and Safety Code section] 25189.5 includes knowledge or negligence as an element of the crime, and so is not a strict liability offense." (*People* v. *Martin, supra,* at p. 713.) However, counts X, XI and XII alleged violations of Health and Safety Code section 25190 by improperly storing and labeling and permitting the leaking of hazardous waste containers, and required no finding of knowledge or negligence.[3]

■ We find that violations of Health and Safety Code section 25190 constitute strict liability offenses or "so-called 'public welfare' or '*malum*

---

[2]Health and Safety Code section 25189.5, subdivision (b) provides as follows: "Any person who is convicted of knowingly disposing or causing the disposal of any hazardous waste, or who reasonably should have known that he or she was disposing or causing the disposal of any hazardous waste, at a facility which does not have a permit from the department issued pursuant to this chapter, or at any point which is not authorized according to this chapter shall, upon conviction, be punished by imprisonment in the county jail for not more than one year or by imprisonment in the state prison for 16, 24, or 36 months."

[3]Health and Safety Code section 25190 provides, in pertinent part, that "any person who violates any provision of this chapter, or any permit, rule, regulation, standard, or requirement issued or adopted pursuant to this chapter, is, upon conviction, guilty of a misdemeanor . . . ." Count X alleged that Matthews (as well as Diceon, Jonas and Thomas) was guilty of on January 19, 1989, "unlawfully [storing] hazardous waste in a container which had open tops and was not closed as required by Section 22-67243 of Title 26 of the California Code of Regulations." Count XI alleged that the same parties on the same date "unlawfully store[d] hazardous waste in containers which were leaking and otherwise not in good condition as required by Section 22-67241 of Title 26 of the California Code of Regulations." Count XII alleged that the same parties on the same date "unlawfully accumulate[d] hazardous waste in

*prohibitum*' crimes which are punishable despite the absence of any criminal intent or criminal negligence." (*People* v. *Calban* (1976) 65 Cal.App.3d 578, 584 [135 Cal.Rptr. 441].) "These public welfare crimes are most often based upon the violation of statutes purely regulatory in nature and involving widespread injury to the public. [Citation.]" (*People* v. *Chevron Chemical Co.* (1983) 143 Cal.App.3d 50, 53-54 [191 Cal.Rptr. 537].) Indeed, the offenses were enacted by the Legislature as part of the Hazardous Waste Control Act "to protect the public health and the environment and to conserve natural resources" (Health & Saf. Code, § 25101, subd. (a)) in light of "[l]ong-term threats to public health and to air and water quality [from the] disposal of many types of untreated hazardous wastes and by the inappropriate handling, storage, use, and disposal of hazardous wastes." (Health & Saf. Code, § 25100, subd. (b); see *People* v. *Martin*, *supra*, 211 Cal.App.3d 699, 713.) Also indicative of a strict liability offense, section 25190 involves relatively "light penalties and no moral obloquy or damage to reputation." (*People* v. *Vogel* (1956) 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850]; see *Morissette* v. *United States* (1952) 342 U.S. 246, 256 [96 L.Ed. 288, 296-297, 72 S.Ct. 240].)

### B. *Defense to the Offenses Charged*

Matthews's effort to establish that "no reasonable cause exists to believe that [he] committed the offense for which the arrest was made" (Pen. Code, § 851.8, subd. (b)) focuses on different but somewhat related defenses to each of the two different types of offenses charged. As to the violations pertaining to the disposal of hazardous waste (Health & Saf. Code, § 25189.5, counts VIII and IX), Matthews urged the trial court to consider the question of his duty, the reasonableness of his reliance on other corporate executives (such as Jonas) and his response to information imparted to him by his subordinates.

Indeed, counsel and the trial court focused on the disposal of hazardous waste violations which occurred between January 19 and April 7 of 1989 (counts VIII and IX), and the court observed that "we have to have some kind of negligence." As previously noted, "[Health and Safety Code] section 25189.5 includes knowledge or negligence as an element of the crime, and so is not a strict liability offense." (*People* v. *Martin*, *supra*, 211 Cal.App.3d at p. 713.) The court ultimately ruled that Matthews "was not negligent because of the efforts he testified [to] with respect to . . . trying to alleviate this condition."

However, counsel and the trial court apparently failed to focus on the strict liability nature of the labeling and storage violations which occurred on

containers and tanks which were not labeled or clearly marked 'Hazardous Waste' as required by Section 22-66508(a)(3) of Title 26 of the California Code of Regulations."

January 19, 1989 (counts X, XI, and XII), offenses for which no showing of negligent conduct is required. Matthews's defense to the strict liability labeling and storage violations of Health and Safety Code section 25190 was based on his purported lack of direct corporate power and authority regarding the hazardous waste violations, despite his position as president of the company and co-owner.[4]

Matthews thus contends on appeal that there is an insufficient factual predicate for his criminal liability because evidence at the hearing on his motion established "that he was only rarely present at the Chatsworth facility [where the hazardous waste violations occurred], that he was unaware of any environmental problems at the Chatsworth facility prior to the [execution of a] search warrant, that he was four managerial levels removed from direct responsibility for environmental conditions at the Chatsworth facility, and that he had no technical training or expertise, particularly in the environmental compliance area." In essence, Matthews claims that he was located in the headquarters in Irvine and was so far up the corporate ladder of a $120 million company with five facilities throughout the country and so far isolated from daily operations and environmental oversight, regarding the environmental compliance activities at the Chatsworth facility, that he was "outside of the scope of even strict liability" for his company's hazardous waste violations.

Matthews asserts his factual innocence based on an analysis of the principles of strict criminal liability in *United States* v. *Park* (1975) 421 U.S. 658 [44 L.Ed.2d 489, 95 S.Ct. 1903] and *United States* v. *Dotterweich* (1943) 320 U.S. 277 [88 L.Ed. 48, 64 S.Ct. 134]. *Park* and *Dotterweich* involved the criminal liability of corporate executives for strict liability offenses committed by their corporation. In *Dotterweich*, the court explained that criminal liability may be assessed against "all who . . . have such a responsible share in the furtherance of the transaction" (320 U.S. at p. 284 [88 L.Ed. at p. 53]) which is the basis of the offense, but declined to "attempt a formula embracing the variety of conduct whereby persons may responsibly contribute in furthering a transaction forbidden by [legislation]." (*Id.* at p. 285 [88 L.Ed. at pp 53-54].)

In *Park*, the Supreme Court addressed the theoretical basis for criminal culpability of the corporate president of a national retail food chain with 36,000 employees, 874 retail outlets and 16 warehouses. Park's office was at

---

[4]At the time of the hazardous waste violations, Matthews was the president of Diceon, which he "acquired" in 1980 with Peter Jonas. At the time of his motion to seal and destroy his arrest records, Matthews was chairman of the board of directors and chief executive officer of Diceon.

the corporate headquarters in Pennsylvania and the various violations of the Federal Food, Drug and Cosmetic Act involving exposure of food to rodent contamination occurred at a warehouse in Maryland. (*Park, supra,* 421 U.S. at p. 660 [44 L.Ed.2d 494].) The court found that the jury was properly instructed that Park could be found guilty if he " 'had a position of authority and responsibility in the situation out of which these charges arose.' " (*Id.* at p. 665, fn. 9 [44 L.Ed.2d at pp. 496-497].) Chief Justice Burger's majority opinion rejected the position of the Court of Appeal (*United States* v. *Park* (4th Cir. 1974) 499 F.2d 839, revd. (1975) 421 U.S. 658 [44 L.Ed.2d 489, 95 S.Ct. 1903]) that criminal liability could only be premised on the presence of some wrongful action by Park.

The Supreme Court explained as follows: "The duty imposed by Congress on responsible corporate agents is . . . one that requires the highest standard of foresight and vigilance, but the Act, in its criminal aspect, does not require that which is objectively impossible. The theory upon which responsible corporate agents are held criminally accountable for 'causing' violations of the Act permits a claim that a defendant was 'powerless' to prevent or correct the violation to 'be raised defensively at a trial on the merits.' . . . [T]he Government's ultimate burden [is to prove] beyond a reasonable doubt the defendant's guilt, including his power, in light of the duty imposed by the Act, to prevent or correct the prohibited condition. . . . [¶] . . . The concept of a 'reasonable relationship' to . . . violation of the Act indeed imports some measure of blameworthiness . . . . [T]he Government establishes a prima facie case when it introduces evidence sufficient to warrant a finding . . . that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so. . . . The considerations which prompted the imposition of this duty, and the scope of the duty, provide the measure of culpability." (421 U.S. at pp. 673-674 [44 L.Ed.2d at pp. 501-502].)

Matthews's request to seal and destroy his arrest records as to counts X, XI and XII is premised on his claims (1) that he had no personal involvement in the criminal violations, and (2) that, in essence, his corporate responsibility for the hazardous waste labeling and storage violations was too attenuated because he had extremely limited contact with the Chatsworth facility (only visited the business office there once a month). However, he fails to allege any facts which would establish, and does not now claim on appeal, that he was actually " 'powerless' " to prevent or correct the violation (*Park, supra,* 421 U.S. at p. 673 [44 L.Ed.2d at p. 501]) and that he somehow lacked sufficient "authority with respect to the conditions that formed the basis of the alleged violations." (*Id.* at p. 674 [44 L.Ed.2d at p. 502].)

Indeed, it appears that Matthews had a position in the corporate structure that would have enabled him to have avoided or addressed the situation which led to the violation. Although Matthews claimed in the declaration in support of his motion that he had only "nominal responsibility" and "no personal supervision or oversight of environmental compliance matters at the Chatsworth facility," he admitted that his responsibility encompassed "all aspects of the company's operations and [was] over all of the company's facilities." While repeatedly characterizing his responsibility as "nominal," Matthews conceded that his "oversight" responsibilities would logically extend to include "responsibility for the company's compliance with all federal, state, and municipal law." According to Matthews, the Chatsworth employees responsible for implementing environmental controls reported to a local supervisor, who reported to codefendant Richard Thomas (director of operations at Chatsworth), who reported to codefendant Peter Jonas (executive vice-president and chief financial officer), who in turn reported to Matthews. A separate environmental officer, Laurey Cook, also had responsibility for environmental compliance at the Chatsworth facility. Cook reported to the director of manufacturing at the Irvine facility, who reported to Jonas, who in turn reported to Matthews.

At the hearing on Matthews's motion to seal and destroy his arrest records, it became even more apparent that his corporate responsibility and authority were not merely nominal. Matthews was one of the company's owners and the highest ranking corporate officer in charge of Diceon at the time of the violations. Matthews had the power with other executives to hire and fire employees, to expend corporate funds to institute corrective measures, and even "personally had the authority to shut the company down." Matthews was also eventually in daily communication with Jonas, who became responsible for bringing the plant into compliance with environmental requirements. Diceon had been cited for hazardous waste violations twice before the execution of the search warrant on January 19, 1989. After execution of the search warrant and Matthews's discovery of some of the violations charged in the information, Matthews met with Jonas and other executives "to set a plan in action." The plan included installing new equipment, hiring an environmental consulting firm, requiring Cook to spend more time at the Chatsworth facility, having Jonas keep Matthews updated on a daily basis, and having the plant shut down numerous times to correct problems.

On appeal, Matthews concedes, as he must, that "it is clear that he wields considerable responsibility and authority over the affairs of all of Diceon's [facilities]." Matthews's corporate responsibility and authority were more than nominal. His responsibility and authority were real, and he exercised

them commendably and effectively, albeit after January 19, 1989. Matthews is thus not a mere figurehead of the company, but is a responsible owner with "not only a positive duty to seek out and remedy violations when they occur but also . . . a duty to implement measures that will insure that violations will not occur." (*Park, supra*, 421 U.S. at p. 672 [44 L.Ed.2d at pp. 500-501].)

 Such an affirmative duty is properly placed on corporate officers by strict liability statutes regulating the public welfare. "[I]n the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger. [Citation.]" (*Dotterweich, supra*, 320 U.S. at p. 281 [88 L.Ed. at pp. 51-52].) Matthews's height on the corporate ladder does not therefore insulate him from strict liability statutes. It is of no consequence that it may have been objectively impossible for Matthews personally to control fully the daily activities at each of several manufacturing facilities. As the Supreme Court observed in *Park*, which involved the liability of a defendant in a corporation apparently at least as large or larger than Diceon, "Assuming, *arguendo*, that it would be objectively impossible for a senior corporate agent to control fully day-to-day conditions in 874 retail outlets, it does not follow that such a corporate agent could not prevent or remedy promptly violations of elementary sanitary conditions in 16 regional warehouses." (*Park, supra*, 421 U.S. 658, 677, fn. 19 [44 L.Ed.2d at p. 504].) It is therefore appropriate as a practical matter and consistent with *Dotterweich* and *Park* to prosecute a person at the highest levels of a corporation as the best way to insure the adoption of corporate policies and practices which will avoid violations of strict liability public welfare and regulatory offenses.

 In our view, persons holding significant shares of corporate responsibility and power are subject to prosecution and conviction for strict liability crimes unless they have exercised their responsibilities and power so as to have undertaken all objectively possible means to discover, prevent and remedy any and all violations of such laws. No evidence presented at the hearing below showed that Matthews had undertaken all objectively possible means to discover, prevent or remedy the criminal violations discovered pursuant to a search warrant on January 19, 1989. He was, therefore, properly subject to arrest, prosecution and conviction for these strict liability crimes. Hence, the trial court should have denied Matthews's motion to seal the records of his arrest and prosecution.

## III. *Conclusion*

As to the strict liability offenses charging violations of Health and Safety Code section 25190 (counts X, XI and XII), Matthews failed to satisfy his

initial burden to show that "no reasonable cause exists to believe that [he] committed the offense for which the arrest was made." (Pen. Code, § 851.8, subd. (b).) The evidence presented at the hearing on Matthews's motion to seal indicated that he had the power to engage all objectively possible means to discover, prevent and remedy the conditions upon which the violations of law here were based. The evidence also indicated Matthews did not utilize this power fully and, as a result, failed to discover, prevent or remedy these conditions. Since Matthews was not powerless to prevent or remedy promptly these violations, sealing of his arrest records is not authorized.

■ Because we find Matthews's defense unavailing in his effort to seal and destroy his arrest records for the strict liability offenses, we need not address his defense of the absence of negligence to the other offenses for which he was arrested relating to the unlawful disposal of hazardous waste, in violation of Health and Safety Code section 25189.5, subdivision (b) (counts VIII and IX). Even if Penal Code section 851.8 provided, which it does not, for the surgical excision of only certain portions of an arrest record, Matthews has not requested such a partial sealing and destruction of his arrest records. We would defeat the statutory purpose of leaving a factually innocent person with an unblemished record and run afoul of the legislative objective sought to be achieved were we to permit the sealing and destruction of only part of an accused's arrest record. (See *Morse v. Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46].) We are also constrained by the principle that penal statutes must be strictly construed to guard against judicial usurpation of the legislative function. (See *People v. Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288].) Accordingly, the trial court erred in granting Matthews's motion to seal and destroy his arrest records, both as to the strict liability offenses and those offenses requiring knowledge or negligence.

DISPOSITION

The order under review is reversed and vacated.

Ashby, Acting P. J., and Grignon, J., concurred.