Filed 2/16/24  In re K.H. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re K.H., a Person Coming Under the Juvenile Court Law. | B321890 |
| | (Los Angeles County Super. Ct. No. YJ40829) |
| THE PEOPLE, | |
| Plaintiff and Respondent, | |
| v. | |
| KENJI AHMAD HOWARD, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, J. Christopher Smith, Judge.  Affirmed.

Carol Watson and Timothy Midgley for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Wyatt E. Bloomfield, Supervising Deputy Attorney General, and Seth P. McCutcheon, Deputy Attorney General, for Defendant and Respondent.

———————————————

**INTRODUCTION**

In 1995, at the age of 16, Kenji Ahmad Howard was implicated in a drive-by shooting that killed Arkett Mejia and paralyzed Travon Johnson. Howard sat in the back seat on the passenger side of the vehicle from which the shots were fired. After he was arrested in possession of the murder weapon, Howard confessed to shooting the victims by leaning forward and firing through the open front window on the passenger side. Howard was convicted of murder, attempted murder, shooting at an occupied motor vehicle, and being a minor in possession of a concealed firearm after trial in 1997 and received a sentence of 35 years to life.

In 2021, after serving 26 years, Howard's murder conviction was vacated pursuant to a habeas corpus petition granted by the Los Angeles County Superior Court in light of newly discovered exculpatory evidence: a sworn confession to the shooting from Edward Powell, the driver of the vehicle. Although the People refiled charges against Howard, they later dismissed all charges.

That same year, Howard filed the present petition in juvenile court for a finding of factual innocence under Welfare

and Institutions Code section 781.5.[1]  His petition sought sealing and destruction of his arrest record in the case, and he alleged, in light of Powell's confession and other corroborating evidence, there was no "reasonable cause" to believe or strongly suspect he was guilty of the charges.

After an evidentiary hearing, the juvenile court denied Howard's petition, citing the circumstances of Howard's arrest, testimony from shooting survivors incriminating Howard, evidence from a *Perkins* operation that cast some doubt on Powell's confession, and gunshot residue evidence from the vehicle.[2]

Howard appeals, arguing the juvenile court applied the wrong legal standard in denying his petition by purportedly focusing on the circumstances of his arrest.  He asserts he met his burden to demonstrate factual innocence.  Our courts have recognized this is an "'incredibly high'" burden requiring "'no doubt whatsoever'" in the petitioner's innocence.  (*People v. Esmaili* (2013) 213 Cal.App.4th 1449, 1459 (*Esmaili*).)  Relief is available only to "'petitioners who can show that the state should never have subjected them to the compulsion of the criminal law—because no objective factors justified official action.'"  (*People v. Adair* (2003) 29 Cal.4th 895, 905 (*Adair*); accord,

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    *Illinois v. Perkins* (1990) 496 U.S. 292 authorized undercover law enforcement questioning of incarcerated individuals without *Miranda* warnings.  *Miranda v. Arizona* (1966) 384 U.S. 436 established a defendant's right against self-incrimination and right to the presence of an attorney during custodial interrogation.

*People v. Chagoyan* (2003) 107 Cal.App.4th 810, 816.)  We conclude the juvenile court applied the correct standard and further conclude, based on our independent review of the record, that Howard has not satisfied his burden.  Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

A.     *Howard's 1997 Conviction*
       1.     *The Information*
       In 1996 Howard was charged as an adult with one count of murder (Pen. Code, § 187, subd. (a)); three counts of attempted murder (*id.*, §§ 187, 664, subd. (a)); one count of shooting at an occupied motor vehicle (*id.*, § 246); and one count of being a minor in possession of a concealed firearm (*id.*, § 12101, subd. (a)(1)).  After a jury trial, Howard was convicted of possessing a concealed firearm as a minor, but the jury was hung on the remaining counts.  Howard was retried in 1997 and convicted of all remaining charges.

       2.     *The Evidence at Howard's Second Trial*
       At the retrial, the People's evidence showed Howard and four friends—Edward Powell, LaKeyna Martin, and two others— visited Dockweiler Beach on March 17, 1995, in a burgundy

_____

[3]     We relate the facts from the superior court's order granting Howard's habeas petition and from this court's previous opinion in Howard's direct appeal.  (See *People v. Howard* (Aug. 26, 2003) B118552 [non-pub. opn.].)  We previously granted Howard's request for judicial notice of the superior court's order granting habeas relief.

4

Oldsmobile Cutlass sedan (Cutlass).  Powell, also known as "Wolf," and Howard were associated with the "Blood" Limehood Piru street gang.  Howard was 16 years old at the time; Powell was 24 or 26 years old.  At the beach, Powell had a gun and took shots at airplanes passing by.  Mejia, Gail Lewis, Landon Martinez, and Johnson were also visiting the beach on that day.  As this group walked back to their car and passed the burgundy Cutlass, Martinez heard a voice from inside the Cutlass saying "give me the strap"—asking for a gun.  Mejia's group returned to their car and headed toward the freeway, with Martinez driving.

As Martinez drove onto the freeway, the burgundy Cutlass pulled alongside.  Powell was driving the Cutlass, with Martin in the front passenger seat and Howard in the back right passenger seat.  Powell and Martin flashed gang signs at the other car through the windows of the Cutlass.  Martinez, Mejia, Lewis, and Johnson did not respond.  Suddenly, someone in the Cutlass fired approximately 10 gunshots into Martinez's car.  Mejia was killed.  Johnson's wounds rendered him comatose and paralyzed him from the neck down.

After the shooting, Powell handed Howard the gun.  Howard was arrested the day after the shooting, after police saw him leaving the gun "behind a plastic trash bag."  Howard stated he had just bought the gun from a drug addict.  Howard was released because law enforcement did not yet know the gun was the murder weapon in the drive-by shooting.

Powell was arrested on March 27, 1995.  Law enforcement impounded Powell's vehicle, the burgundy Cutlass, and noted the rear windows in the car did not roll down.

a.      Howard's interrogation and confession

At trial, the People introduced evidence Howard confessed to the shooting during an interrogation.

Howard was first brought in for questioning 10 days after the shooting and waived his *Miranda* rights.  He told investigators he was sleeping in the back of the Cutlass when he was awakened by gunshots.  Howard stated he saw Powell firing the shots through the open front passenger window.

In May 1995 Howard was questioned a second time by Los Angeles County Sheriff's Deputy Linda Quinonez.  He again waived his *Miranda* rights and agreed to take a polygraph test.  During the polygraph, Howard maintained Powell was the shooter.  After the test, Quinonez told Howard he had failed the polygraph exam and pressed Howard to tell the truth.  She suggested that Howard's story did not add up with other witness accounts and speculated Powell made Howard shoot the gun because Powell was driving and because, as a minor, Howard would face a "lighter" consequence.  Howard continued to assert Powell was the shooter.

After more than three hours of questioning, Howard confessed he was the shooter.  He said that as Powell pulled alongside Martinez's car, Powell "start[ed] flashing gang signs, and that he also start[ed] flashing gang signs."  Howard said Powell threatened to hurt him if he did not shoot, so Howard fired the gun through the front passenger window but did not intend to hurt anyone.  Howard said, "he rested his wrist on the top of the open window in the door, he pointed the gun downward, and he fired several shots."

Howard repeated his confession to other law enforcement investigators after the polygraph interrogation.

b.     Forensic firearm analysis

The People introduced firearm analysis evidence through their expert witness, Los Angeles County Sheriff's Department firearms examiner Richard Catalani.  Catalani examined Powell's burgundy Cutlass and Martinez's car for gunshot residue and bullet trajectory.  Catalani testified he found gunshot residue "on the inside of Powell's passenger door," which was consistent with the gun being fired inside the car.  Catalani found no gunshot residue on the outside of the passenger door, which would have indicated the gun being fired outside the car.

c.     Testimony from Lewis and Martinez

Two surviving victims from the shooting—Lewis and Martinez—also testified at trial.

Lewis testified that as the Cutlass pulled alongside them before the shooting, she saw a driver wearing a beanie and a passenger with pigtails.  At the time of the shooting, Howard wore his hair in pigtails.  But Lewis could not recall whether the passenger with pigtails sat in the front or back seat.  Lewis did not see who did the shooting.

Martinez testified he saw a person with pigtails in the back seat on the passenger's side of the Cutlass.  Like Lewis, Martinez did not "see a person actually shooting the gun," but two or three seconds before the gunshots began, Martinez saw the driver with both hands on the wheel.  While Martinez did not see the gun, Martinez saw muzzle flash coming from the "lower left corner" of the passenger's side window.  Martinez could not identify the person who fired the shots and did not recognize Howard as someone from the shooting.

### 3.   *Howard's Conviction and Sentence*

The jury convicted Howard of one count of first-degree murder, three counts of attempted murder, and one count of shooting at an occupied vehicle.  The jury also found true allegations that, as to all counts, Howard discharged a firearm at an occupied motor vehicle, and as to the attempted murder of Johnson, that Howard inflicted great bodily injury.

Howard was sentenced to 25 years to life on the murder count, plus 10 years for the firearm enhancement.  He received a life sentence on the attempted murder counts, with an additional seven years for the special allegation of great bodily injury.

## B.   *Powell's 2006 and 2007 Confessions*

After Howard's confession, Powell was also tried and convicted in 1995 of murder and attempted murder as an aider and abettor of the shooting.

In 2006 Powell was interviewed in prison by Eric Lessard, a licensed private investigator retained by Howard's mother and his attorney.  Powell admitted to Lessard that he committed the shooting and Howard was innocent.  Powell described that Howard was asleep in the back seat when Powell and Martin, the front seat passenger, decided to intimidate the people in Martinez's car.  Powell then told Martin "to bend down low, and she did so.  I removed the gun from my waistband, pointed it with my right hand out the passenger window, and fired" at Martinez's car.  Powell stated Howard "was asleep in my back seat when I did the shooting . . . where there are no windows that can go up or down.  I am 100% positive that he did not and could not have shot a gun from where he was sitting . . . Kenji [Howard] was not involved in any way in the shooting, nor was

8

he involved in the gang sign throwing that preceeded [sic] the shooting."

Powell explained when they returned home, not knowing that anyone had been shot, he handed the gun to Howard and told him to keep it in his apartment. Howard was arrested with the gun while bringing it back to Powell.

Powell stated he was "surprised" to hear about Howard's confession to police, "because I was the only shooter and Kenji was not included in any way." For "years after," he was angry at Howard for confessing because "[h]is confession made it easier for me to be convicted. My only thought was that his talking got me in trouble." Powell expressed a change of heart saying, "more than 10 years have gone by, my feelings have changed . . . Kenji does not deserve to be in prison for this. I am responsible for this whole situation. Kenji is only responsible for confessing to something he did not do."

Powell and Lessard drafted a handwritten confession. Powell approved each sentence as it was written, then signed the completed declaration.

Also in 2006 Powell began speaking with a childhood friend, Badia Hill, during his incarceration. Hill, Powell, and Howard grew up in the same neighborhood and knew each other. Powell separately told Hill that he was the shooter, Howard was innocent, and he gave Howard the gun after they returned home from the shooting.

Finally, in June 2007, Powell independently typed and signed a copy of the declaration he drafted with Lessard.

C.     *Howard's 2019 Habeas Petition*

In 2019, through counsel, Howard filed a new petition for writ of habeas corpus with this court.[4]  Howard alleged actual innocence, coerced confession, unconstitutional waiver of his *Miranda* rights, unconstitutional interrogation, and ineffective assistance of counsel.  Upon direction from the California Supreme Court,[5] the superior court held an evidentiary hearing on Howard's petition.

At the hearing, Howard introduced Powell's written confessions, testimony from private investigator Lessard explaining the circumstances of Powell's confession, and testimony from Hill recounting that Powell told her Howard was innocent.  Howard also presented new testimony from Catalani, the firearm expert at Howard's original trial.

---

[4]     Prior to his 2019 habeas petition, Howard unsuccessfully appealed his conviction and sentence.  Howard also filed a federal habeas petition in 2004 alleging his confession was coerced, but this petition was denied.  After Powell confessed to the shooting in 2006, Howard filed four habeas petitions in propria persona in state court in July 2007, September and October 2011, and September 2018, alleging newly discovered evidence and actual innocence, among other claims.  These petitions were denied.

[5]     This court initially denied Howard's petition.  Howard then successfully petitioned for review with the California Supreme Court.  The Supreme Court directed this court to vacate the denial of Howard's petition and issue an order to show cause why the petition should not be granted based on "newly discovered evidence casting fundamental doubt on the prosecution's case."

### 1. *Catalani's Revised Firearm Analysis*

At the evidentiary hearing, Catalani testified he had not reviewed Howard's confession before testifying at his trial. Now knowing about Howard's confession, Catalani asserted the gunshot residue and the bullet trajectory were inconsistent with the manner in which Howard confessed to shooting from the car, that is from the back seat, through the front passenger window, with his wrist resting on the window frame.

Catalani reexamined the reports he prepared for Howard's criminal trial in light of Howard's confession. Catalani described testing the actual murder weapon to determine its pattern of ejecting gunshot residue. Noting the gunshot residue was present on the inside of the passenger door, Catalani explained if Howard had fired the gun by resting his wrist on the open window and holding the gun outside the car, it would be impossible for residue to accumulate on the inside of the door, even accounting for any wind blowing through the open window. Catalani opined the residue pattern he observed was consistent with the driver of the car shooting the gun. Catalani also acknowledged that, if either the driver or the rear right passenger fired the gun, the gunshot residue would be consistent with that series of events.

Catalani also observed bullet holes in Martinez's car indicating the bullets traveled through the car from "front to back," meaning the bullets entered from the front of the car and exited toward the back of the car. Because Howard was seated in the back seat and would have had to fire the gun through the front passenger window, Catalani stated the bullet trajectory he observed would be "unlikely" if Howard had fired the gun in the manner confessed. Catalani believed it was "awkward, if not

11

impossible" for Howard to have fired the shots from the back seat, given the physical firearm evidence.

### 2. *The People's New Firearm Analysis*

The People called Robert Keil, a new firearm expert also from the Los Angeles County Sheriff's Department. Keil did not agree with Catalani's "front to back" bullet trajectory assessment without further evidence. Keil also disagreed with Catalani's methodology for testing the vehicle for gunshot residue. Based on the design of the Cutlass, a coupe-style vehicle, Keil believed "it would not be difficult for a rear passenger to reposition themselves in the seat to either place their hand or wrist on the window opening or to extend an arm out the window." Ultimately, however, Keil agreed the gunshot residue actually found in the car could be consistent with the driver, the rear passenger, or both having fired the gun.

### 3. *Hill's Testimony*

Hill testified to knowing both Powell and Howard for 30 years, having grown up in the same neighborhood. Hill visited Howard in prison and communicated by phone with both Powell and Howard during their incarceration. Hill testified Powell told her Howard was innocent, but that she had not thoroughly discussed the shooting with Powell. Hill said Howard told her he was asleep in the back seat and that he took the gun from Powell.

### 4. *The Habeas Court's Ruling*

After the evidentiary hearing, on July 16, 2021 the superior court granted Howard's habeas petition, vacated his convictions, and recalled his sentence. The superior court concluded Howard

12

had presented newly discovered evidence—Powell's confession—that would have likely changed the outcome of his trial.  (See Pen. Code, § 1473, subd. (b)(1)(C)(i).)  The court noted Powell's confession was "corroborated by the physical evidence" of the gunshot residue and by all other evidence at trial, except Howard's own confession.  The court further concluded "[Howard's] confession and the physical evidence do not align" because "in order for Petitioner's confession to be true, Petitioner would have had to lean towards Martin in the front passenger seat, rotate his seat clockwise to a 45 degree angle while jammed in by two other rear passengers, then cock his wrist awkwardly, place his arm outstretched with his wrist at a right angle resting on the window, and fire a 9 millimeter pistol out the window."

D.    *The 2021 Information Against Howard*
       On August 27, 2021 the People filed a new information, charging Howard with the same six counts as before.

E.    *Powell's Statements in the 2021* Perkins *Operation*
       As part of the investigation into the newly filed charges, homicide detectives with the Los Angeles County Sheriff's Department conducted a *Perkins* operation to speak with Powell in prison.  On October 21, 2021 the detectives arranged to have Powell and a "cooperative agent" transported from state prison in a van and placed in a cell in Los Angeles County jail.  Both the van and the cell were wired to record their conversation.
       During the operation, Powell discussed the shooting of Mejia and Johnson with the undercover *Perkins* agent.  Powell referenced his written confession to the shooting and said, "'My confession is true.'"  He directly admitted to "popping" the victims

13

of the shooting.  He admitted, "'I'm already convicted, and I'm guilty of it.'"  But Powell stated he would not formally testify to committing the shootings unless he received immunity from prosecution, because he was concerned about being prosecuted for the murder of Johnson, who died from his injuries in 2013.

At some point in the operation, homicide detectives pulled Powell from the cell and offered him "the opportunity to make a statement regarding the case."  The detectives told Powell they were investigating new state and possibly federal charges against Howard, and they wanted to speak with Powell about his sworn confession.  They further informed Powell the district attorney was considering filing a new murder charge against Powell for the intervening death of Johnson.  With respect to Powell's confession, the detectives stated:  "there's some allegations that there's some money promises and stuff like that—financial stuff."  Powell declined to speak with the detectives without an attorney.

After the detectives alleged Powell was compensated to confess, Powell returned to the cell and remarked to the *Perkins* agent, "They know some information about some bread being exchanged homie."  Powell continued, "[S]omebody said something to them, man, 'cause they wouldn't know that.  Somebody'd have to tell—maybe Kenji?"  "They know some information though.  I don't know where they got that.  Somebody spilled the beans.  Spilled the beans on me.  I know that little homie didn't tell them that.  That wouldn't be in his best interest."

14

F.    *Dismissal of Refiled Charges Against Howard*

On December 2, 2021 the Los Angeles County District Attorney's Office dismissed all charges against Howard without prejudice.

G.    *The Factual Innocence Proceedings*

1.    *Howard's 2021 Factual Innocence Petition*

On December 9, 2021 Howard, through counsel, filed a petition for a finding of factual innocence under section 781.5, requesting sealing and destruction of his arrest records. Howard attached exhibits, including Powell's handwritten and typed confessions, a new report analyzing Howard's confession from false-confession expert Dr. Richard Leo, a new declaration and letter from Martin, Hill's declaration, trial testimony and a declaration from firearm analyst Catalani, interrogatories from investigator Lessard, and original trial testimony from witnesses Lavenski Harrell and Tameka Brown.

a.    Martin's declaration and letter

Howard submitted a 2018 declaration from Martin, the front-seat passenger in the Cutlass on the day of the shooting. Martin confirmed she rode next to Powell as they drove after Martinez's car. She stated: "When we got alongside that car the people looked straight ahead and ignored us. [¶] Powell yelled at me, 'Get down!' I did so immediately. Powell started shooting toward the open passenger window. This happened so suddenly that I couldn't understand what he was going to do." Martin declared: "Kenji Howard did not fire the gun. Edward Powell is the only person who fired the gun. Kenji was not involved in the

15

shooting in any way and none of us had any way to predict that it would happen."

Also attached was an undated letter from Martin to Howard expressing, "I[']m sorry for not having the courage" to come forward sooner. Martin explained when she heard from Howard's private investigator, "I knew then that this knowledge[,] this past[,] is what weighs heavy on my heart. Kenji[,] Wolf is a manipulator and he manipulated you of your freedom and me of not being able to do what's right by stating true facts but I[']m not 17 anymore and my heart needs a cleanse and you deserve to be free."

### b.     Dr. Leo's report on false confessions

Howard also presented a 32-page report from Dr. Leo (solicited by Howard's counsel), explaining social science research on false and coerced confessions and analyzing the circumstances of Howard's interrogation and confession. Dr. Leo, a professor of law and psychology at the University of San Francisco, explained his qualifications as a researcher, author, and analyst focused on police interrogation and coerced confessions. Dr. Leo reported reviewing the transcript of Howard's interrogation and confession in the polygraph examination, along with numerous other case materials.

Dr. Leo's report drew five conclusions: (1) "The custodial interrogation of Kenji Howard was guilt presumptive, accusatory and theory-driven," designed to "intentionally incriminate Kenji Howard by coercively, deceptively and unlawfully breaking down his denials of guilt and eliciting a statement of guilt from him that was consistent with the deputy's pre-existing and prematurely formed assumptions;" (2) interrogator Quinonez

16

"used interrogation techniques that are known to increase the risk of overbearing a suspect's will and eliciting false and unreliable statements . . . when misapplied to the innocent;" (3) Quinonez's techniques were "highly likely to cause a suspect to perceive that he or she has no choice but to comply with the interrogator's demands and/or requests;" (4) Howard was at "substantially heightened risk" of "agreeing to a false and unreliable confession statement because of his personality traits and psychological make-up . . . especially his youth and psychosocial immaturity at the time;" and (5) the defense's false-confession expert at Howard's trial was "neither a recognized nor published expert" and "failed to cover almost every important issue" relevant to Howard's case.

        c.      Brown's testimony from Howard's first trial

Finally, Howard presented trial testimony from Brown, a member of Howard and Powell's beachgoing group who left Dockweiler Beach at the same time in a different car. Brown testified at Howard's first trial, but not the second where he was convicted. Brown stated she was in a car traveling right behind Powell's car, when she saw Powell "having words with another car. He was shouting gang names." Brown was able to see Powell firing shots out of the car, and the front-seat passenger was "bending forward at the waist so he could shoot over her." The next day, Brown testified, Powell "came up and he was just like nobody mention my name or if we do he was going to kick our butts. He wouldn't kick our butts, but he was using other words."

17

### 2. *The People's Opposition*

The People opposed Howard's petition. The People argued the habeas court's factual findings were not binding in a factual innocence context and requested the court hold an evidentiary hearing to resolve the petition.

### 3. *The Evidentiary Hearing*

The juvenile court held an evidentiary hearing on Howard's petition on April 25 and 26, 2022. At the hearing, the People moved to exclude Powell's declarations and Dr. Leo's false confession report as not "reliable" within the meaning of section 781.5, subdivision (b). The court deferred its ruling on the reliability of Powell's declarations but admitted Dr. Leo's report "only as it relates to the science" of false confessions, "not as it relates to the ultimate issue in this case."

The People also presented witness testimony at the hearing. The People called Robert Keil, the firearm analyst who testified at Howard's habeas hearing, to reiterate his opinion the gunshot residue evidence supported a backseat shooter. The People then called Sergeant Detective Daniel Egore, one of two homicide detectives who ran the *Perkins* operation.

#### a. Detective Egore's testimony

Detective Egore described the planning of the *Perkins* operation and his personal interactions with Powell during the operation. Through Detective Egore's testimony, the People introduced audio recordings of Powell's statements during the *Perkins* operation.

Detective Egore confirmed that during the operation, he and his partner attempted to talk with Powell about the case, but

18

Powell would not speak with them. During this interaction, Detective Egore testified that, "Prior to putting [Powell] back in the cell we just basically stalemated him by saying we heard about a money exchange and put that out there." When asked on cross-examination about the source of the allegations that Powell was paid to confess, Detective Egore testified "[m]y partner and I" "made that allegation."

### 4. *The Juvenile Court Denies Howard's Factual Innocence Petition*

On May 24, 2022 the juvenile court ruled on Howard's petition.

As an initial matter, the court determined Powell's declarations confessing to the shooting were reliable because they were corroborated by other evidence in the case. The court agreed with Dr. Leo's analysis of the coercive tactics used to interrogate Howard and found that Howard's confession was involuntary, so it did not undermine the reliability of Powell's subsequent confessions. The court also considered Powell's statements during the *Perkins* operation and found they corroborated his declarations. Because Powell's confessions were corroborated by other evidence, the juvenile court determined the declarations were admissible under section 781.5.

Although it found Powell's "statements made in both declarations are sufficiently reliable and they indicate petitioner was not the shooter in this incident," the court observed that "whether those statements are truthful ha[s] yet to be resolved." The court continued, "Moreover, I considered the issue of possible payment [for] his declarations but I'm not sure how that should be interpreted. Was he paid to write false declarations; was there

19

a promise to be paid for coming forward and telling the truth, or was there a payment contemplated for some other reason?" The court concluded that the issue of possible payment "goes to the weight and not the admissibility" of Powell's declarations.

Turning to Howard's burden to show factual innocence, the juvenile court explained the standard for granting the petition: "Has the petitioner established that no reasonable cause exists to believe that the petitioner had committed the charged offense? Put another way, would a person of ordinary care and prudence have been led to believe and conscientiously entertain an honest and strong suspicion that petitioner committed the violations? To establish a finding of factual innocence one must show as a prima facie matter not necessarily just that the arrestee had a viable substantive defense to the crime charged, but more fundamentally that there was no reasonable cause to arrest him in the first place."

Reviewing the evidence, the court observed "petitioner was arrested in possession of the murder weapon" and "told multiple lies" about his possession of the gun and involvement in the shooting. The court also considered the gunshot residue evidence, including expert testimony from Catalani and Keil. But the court concluded this evidence was "much to do about nothing at this point," because Powell admitted in the *Perkins* operation that he had committed as many as "four or more other prior shootings from the car," so "there's no telling if the [gunshot residue] found in that vehicle is related to the incident in question or some other prior shooting." Finally, the court analyzed the trial testimony from shooting survivors Lewis and Martinez, noting neither "could identify the shooter" but Martinez "observed the driver with both hands on the wheel of

20

the car," "an individual in the rear passenger seat with pigtails," and "sparks or muzzle flashes coming from that rear passenger window area." In light of these factors, the court concluded, "the petitioner has a viable substantive defense to these charges, and I fully understand why the district attorney's office has declined further prosecution at this time. However, I do not believe that the petitioner has met their burden."[6]

Howard timely appealed.

## DISCUSSION

Howard argues the juvenile court wrongly denied his section 781.5 petition by focusing solely on whether, at the time of Howard's arrest, there was reasonable cause to arrest him for the crime. Even if we were persuaded the juvenile court applied an incorrect standard (and it did not), on appeal our independent review of the record leads us to affirm because Howard has not satisfied his burden to show "'that no reasonable cause exists to believe'" he "committed the offense[s] charged." (*Adair, supra,* 29 Cal.4th at p. 905.)

A.    *Governing Law and Standard of Review*

When a minor is arrested and the accusations are dismissed, section 781.5, subdivision (d), authorizes the minor to petition the juvenile court[7] for sealing and destruction of the case

---

[6]    Despite denying Howard's petition, the court sealed Howard's record under section 786, subdivision (e).

[7]    Howard was arrested as a minor and, after a hearing, his case was transferred from juvenile court to criminal court, where

21

record based on his "factual innocence."[8] "A finding of factual innocence and an order for the sealing and destruction of records pursuant to [section 781.5, subdivision (b)] shall not be made unless the court finds that no reasonable cause exists to believe that the minor committed the offense for which the arrest was made or the citation was issued. In any court hearing to determine the factual innocence of a minor, the initial burden of proof shall rest with the minor to show that no reasonable cause exists to believe that the minor committed the offense for which the arrest was made or the citation was issued." (§ 781.5, subd. (b).) At the hearing, the minor and the district attorney may present all "material, relevant, and reliable" evidence. (*Ibid.*) If the minor meets his initial burden to show no reasonable cause to believe he committed the offense, the burden shifts to the district attorney to show that reasonable cause does exist. (*Ibid.*)

---

he was charged and tried as an adult. The parties agree that, as a former minor, Howard properly filed his factual innocence petition in juvenile court under section 781.5, subdivision (d).

[8]     Section 781.5, which applies to juvenile delinquency records, is a counterpart to Penal Code section 851.8, which governs the sealing and destruction of non-juvenile criminal records in the circumstance of factual innocence. The statutes share the same procedure and standard for assessing factual innocence and both place the burden of proof on the petitioner. (Compare § 781.5 with Pen. Code, § 851.8.) The parties agree these statutes are interpreted in tandem.

"'Reasonable cause'" exists where a "'person of ordinary care and prudence'" would "'believe or conscientiously entertain any honest and strong suspicion that the person arrested is guilty of the crimes charged.'" (*Adair*, *supra*, 29 Cal.4th at p. 906; accord, *People v. Laiwala* (2006) 143 Cal.App.4th 1065, 1069 (*Laiwala*) ["'"'"Reasonable cause"'"' is a well-established legal standard, "'defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime."'"'"].) Thus, for relief under section 781.5, the petitioner must establish "facts exist which would lead no person of ordinary care and prudence to believe" in his guilt. (*Adair*, at p. 904; see *id.* at p. 906 ["'reasonable cause'" is an "objective question measured by an external standard"].) In other words, the record before the juvenile court must "exonerate" the petitioner, "not merely raise a substantial question as to guilt." (*Id.* at p. 909.) As noted above, relief is available only to "'petitioners who can show that the state should never have subjected them to the compulsion of the criminal law—because no objective factors justified official action.'" (*Id.* at p. 905; accord, *People v. Bleich* (2009) 178 Cal.App.4th 292, 299 (*Bleich*); *People v. Chagoyan, supra,* 107 Cal.App.4th at p. 816.)

Reviewing the denial of a petition for a determination of factual innocence, we "defer to the trial court's factual findings to the extent they are supported by substantial evidence, but independently review the record to determine whether the defendant sustained his burden of showing that no reasonable cause exists to believe he or she committed the charged offense." (*Esmaili, supra,* 213 Cal.App.4th at pp. 1457-1458; accord, *Bleich*, *supra*, 178 Cal.App.4th at p. 300.) We independently

23

review the record because "'reasonable cause'" "impose[s] an objective legal standard on both trial and appellate courts, and do[es] not accommodate any exercise of discretion." (*Adair, supra*, 29 Cal.4th at p. 908.)

B.      *The Juvenile Court Applied the Correct Standard for Factual Innocence*

Howard challenges the juvenile court's articulation of the "reasonable cause" standard as contrary to the language, purpose, and history of section 781.5. At the hearing, the court stated as follows: "To establish a finding of factual innocence one must show as a prima facie matter, not necessarily just that the arrestee had a viable substantive defense to the crime charged, but more fundamentally that there was no reasonable cause to arrest him in the first place." Howard asserts he was improperly denied relief because the juvenile court determined there was probable cause to arrest Howard and disregarded post-arrest evidence of Howard's innocence.

The juvenile court did not misstate or misapply the applicable standard. Assessing whether "reasonable cause" to believe or suspect the petitioner is guilty of the charged crimes, the court must consider all facts and evidence pertaining to the petitioner's guilt or innocence. This includes the circumstances justifying the petitioner's arrest (see *People v. Matthews* (1992) 7 Cal.App.4th 1052, 1056 (*Matthews*) [considering "reasonable cause to arrest [petitioner] in the first place"]; accord, *People v. Hollie* (2023) 97 Cal.App.5th 513, 551; *People v. Mazumder* (2019) 34 Cal.App.5th 732, 738-739) and any post-arrest or post-conviction evidence. (See *People v. Medlin* (2009) 178 Cal.App.4th 1092, 1101-1102 (*Medlin*) ["The [factual

24

innocence] hearing is not limited to the evidence presented at trial. [Citation.]  The court may consider any evidence relied upon to arrest and charge . . . . The court may consider facts disclosed after arrest."]; *Tennison v. California Victim Comp. & Government Claims Bd.* (2007) 152 Cal.App.4th 1164, 1175; *Adair*, *supra*, 29 Cal.4th at p. 905, fn. 4.)

The juvenile court considered all the relevant pre- and post-arrest evidence, including the circumstances of Howard's arrest, the expert testimony on the gunshot residue evidence, the trial testimony of the surviving victims, Powell's later confessions, Powell's statements in the *Perkins* operation, Martin's statements before and after trial, and the circumstances of Howard's confession.  In sum, the juvenile court applied the correct standard to Howard's petition by considering all relevant evidence.

C.      *Howard Did Not Meet His Burden To Show "No Reasonable Cause" Existed For Believing He Committed the Offenses for Which He Was Convicted*

Under section 781.5, the court "'cannot grant relief if *any* reasonable cause' warrants a belief in the defendant's guilt." (*Esmaili*, *supra*, 213 Cal.App.4th at p. 1460.)  The court must consider all "'reasonable interpretation[s] of the evidence'" in the case, not just one interpretation of the evidence.  (See *Adair*, *supra*, 29 Cal.4th at p. 909; accord, *Esmaili*, at p. 1460 [despite dismissal of charges for insufficient evidence, considering whether "another person of ordinary care and prudence could view the evidence differently and have some suspicion of the defendant's guilt"].)

This burden is "'incredibly high'" and requires "'no doubt whatsoever'" in the petitioner's innocence. (*Esmaili, supra,* 213 Cal.App.4th at p. 1459.) For instance, a petitioner may carry this burden by demonstrating "the absence of any evidence" as to an element of the crime or the legal impossibility of committing the crime. (See *Laiwala, supra,* 143 Cal.App.4th at p. 1071 [petitioner arrested for grand theft of a trade secret established factual innocence because there was "*no* evidence at the criminal trial that the [source code taken] qualified as a trade secret"]; *People v. McCann* (2006) 141 Cal.App.4th 347, 356-358 [petitioner arrested for practicing medicine without a license showed factual innocence because, as a validly licensed physician, he "could not possibly have committed the offense"]; accord, *Matthews, supra,* 7 Cal.App.4th at pp. 1056-1057 [some "legal defenses may be so related to the defendant's own conduct that the existence of the defense negates a requisite element of the offense or otherwise eliminates culpability, thereby revealing no reasonable cause to believe the arrestee committed an offense and establishing factual innocence"].)

Howard asserts the record exonerates him because of Powell's repeated admissions of sole responsibility for the shooting to Lessard, Hill, and the *Perkins* agent. Howard adds that Brown and Martin personally witnessed Powell commit the shooting, and there was evidence Powell intimidated them into not coming forward sooner. Addressing Martinez's testimony, Howard recounts that Martinez testified inconsistently across Powell and Howard's trial proceedings, but Martinez "has never been able to identify the person who fired the shots." And as to his own confession, Howard refers to the juvenile court's finding

that the confession was coerced and submits his coerced confession is inadmissible.

On this record, Howard has raised "a substantial question" as to whether he is guilty of the charged crimes. (See *Adair*, *supra*, 29 Cal.4th at p. 909.) The juvenile court remarked that "after reviewing everything I believe that there's sufficient reason not to file on this or pursue a prosecution on this case." But whatever the juvenile court's or even this court's "own interpretation of the evidence" (see *id.* at p. 905), we cannot conclude Howard met his burden to show no reasonable cause exists to believe he committed the offense and that "'the state should never have subjected [him] to the compulsion of the criminal law.'" (See *ibid.*)

It is undisputed Howard was present in the Cutlass during the shooting on the passenger side of the car from where the shots were fired. It is also undisputed Howard possessed the murder weapon on the night of the shooting and was arrested with the gun the morning after. (Cf. *Bleich*, *supra*, 178 Cal.App.4th at p. 303 [finding reasonable cause petitioner made terrorist threats via phone, even though her cell phone records did not reflect the calls, where the petitioner may have hidden a second cell phone].) Howard gave shifting explanations to police for possessing the gun. (See *Adair*, *supra*, 29 Cal.4th at p. 909 [finding reasonable cause to believe petitioner was guilty where "'defendant constantly changed her explanation of what had taken place'"]; accord, *Bleich*, *supra*, 178 Cal.App.4th at p. 303.) As Howard and Powell were associated with the Limehood Piru gang, and the throwing of gang signs accompanied the shooting, this evidence reasonably shows Howard's motivation to participate in the shooting. [*Adair*, at

27

p. 909 [reasonable cause for murder where a "'reasonable view of the evidence'" suggested petitioner's "'motivation to kill her husband'"].)

By all accounts, the gunshot residue evidence left open the possibility Howard shot the gun from the back seat of the Cutlass. (Cf. *Adair, supra*, 29 Cal.4th at pp. 899-900, 909 [reasonable cause to believe in petitioner's guilt where her injuries could have resulted from alleged home invasion or "'a condition that could have arisen without any injury'"]; accord, *Bleich, supra*, 178 Cal.App.4th at pp. 298, 302 [reasonable cause of petitioner's guilt where the audio recording of terrorist threats was "'hard to understand,'" resulting in mixed opinions of whether it was the petitioner's voice].)

Further, Martinez's trial testimony provided circumstantial evidence that Howard was the shooter. Martinez noted Powell's hands on the wheel a few seconds before the shooting started, then observed muzzle flash coming from the "lower left corner" of the passenger window, near where Howard was seated in the back seat on the passenger side. The testimony of a single witness is sufficient to preclude a finding of factual innocence, even where the witness displays credibility issues. (See *Esmaili, supra*, 213 Cal.App.4th at pp. 1455-1456, 1461 [affirming denial of factual innocence petition where only alleged victim testified to the petitioner's continuous sexual abuse, albeit with "inconsistencies"].) And even "'circumstantial'" evidence can establish reasonable cause to believe in a petitioner's guilt. (See *Adair, supra*, 29 Cal.4th at p. 909; *Bleich, supra*, 178 Cal.App.4th at p. 298.)

Finally, at the time Powell signed his confessions, Powell was serving a life sentence for aiding and abetting the murder and attempted murders.  A reasonable person could conclude Powell had nothing to lose by accepting responsibility for the shooting because he did not face any additional criminal penalty.  And, based on Powell's statements to the *Perkins* agent about "bread being exchanged," a "person of ordinary care and prudence" could "honest[ly] and strong[ly]" suspect Powell had some financial motivation for confessing to the shooting.  (See *Adair*, *supra*, 29 Cal.4th at p. 904.)

Because Howard has not met his burden of demonstrating that no reasonable cause exists, we affirm the denial of Howard's section 781.5 petition.[9]

---

[9]     We note Howard may pursue a remedy under Penal Code section 1485.55, subdivision (d), as a petitioner who has been "granted a writ of habeas corpus" pursuant to "subdivision (b) of [Penal Code] Section 1473" and "the charges were subsequently dismissed."  Under that section, "the petitioner may move the court for a finding that they are entitled to approval of a claim for compensation" and "[t]he court shall grant the motion unless the district attorney objects in writing within 15 days from when the person files the motion and can establish by clear and convincing evidence that the person committed the acts constituting the offense and is therefore not entitled to compensation."  (Pen. Code, § 1485.55, subd. (d)(1); see *Gonzales v. California Victim Compensation Board* (2023) 98 Cal.App.5th 427, 442, fn. 8 ["In a legislative amendment effective on January 1, 2022, the *People* now bear the burden of proving an inmate's guilt by clear and convincing evidence if the inmate is exonerated through the grant of a writ of habeas corpus in state or federal court."].)

## DISPOSITION

The juvenile court's denial of Howard's petition under section 781.5 is affirmed.


MARTINEZ, J.

We concur:


SEGAL, Acting P. J.


FEUER, J.